William J. HENRY, as Trustee in Bankruptcy of G. George Field, Bankrupt, Plaintiff,

v.

G. George FIELD and Rose Eitingon Field, Defendants.

United States District Court
S. D. New York.

May 10, 1962.

———◆———

Henry & Myers, New York City, for plaintiff; Allen Murray Myers, New York City, of counsel.

Gainsburg, Gottlieb, Levitan & Cole, New York City, for defendants; Louis A. Tepper, New York City, of counsel.

WEINFELD, District Judge.

This is an action by the trustee in bankruptcy of G. George Field to set aside as fraudulent certain transfers of moneys and securities made by him to his wife. The complaint charges that the transfers were in violation of section 70,

sub. e of the Bankruptcy Act [1] and Article 10 of the Debtor and Creditor Law of the State of New York.[2]

The husband, the bankrupt, is a dentist who has been engaged in the active practice of his profession since 1925. In 1952 one Hyman Freedman commenced an action in this Court charging the husband and a corporation controlled by him with infringement of a patent for an artificial dental structure. In August 1956 an interlocutory judgment was entered which upheld the validity of the patent, found it had been infringed by Field and his corporation, and appointed a special master to determine damages.[3] Upon appeal the interlocutory judgment was upheld.[4] The hearings before the special master commenced in February 1957 and were concluded in January 1958; on February 27, 1958 he filed his report. The District Court confirmed the special master's report on October 10, 1958 and pursuant thereto judgment was entered against Field and the corporate defendant in the sum of $16,917.62.

On July 1, 1959 Field filed a voluntary petition in bankruptcy in this Court and was duly adjudicated a bankrupt. His schedules list liabilities of $173,940 (including "approximately" $100,000 to his wife for "loans and advances") and no assets other than his dental office furniture and equipment subject to a chattel mortgage in favor of his wife, one of the items here challenged. Freedman filed a proof of debt for the amount of his judgment, which was also listed in the schedules. No payment has been made to creditors who filed proofs of claim.

The transfers still under attack [5] were all made in 1957, the first shortly before the special master commenced his hearings. These transfers were:

1. 11 U.S.C.A. § 110, sub. e.

2. N.Y. Debtor and Creditor Law, McKinney's Consol.Laws, c. 12, §§ 270–281.

3. Freedman v. Overseas Scientific Corp., 150 F.Supp. 394 (S.D.N.Y.1956).

4. Freedman v. Overseas Scientific Corp., 248 F.2d 274 (2d Cir. 1957).

(1) On February 13th and March 12th, 1957, the sum of $7,200 in cash used to purchase in the wife's name a cooperative apartment.[6] The funds turned over to the wife were borrowed by the husband against securities in his name in his brokerage account.

(2) On May 28, 1957,

    50 shares Arkansas Fuel Oil Corp.

    48 shares J. I. Case Co.

    100 shares Cornell Dubilier Electric Corp.

    100 shares Philip Morris

    100 shares T X L Oil Corp.,

all originally registered in the husband's name. The value of the shares on the date of transfer to the wife was $11,971.-50.

(3) Also on May 28, 1957, the husband executed a chattel mortgage in the sum of $2,500 in favor of the wife on the furniture and equipment in his dental office.

The complaint alleges that the above transfers and conveyances by the husband to the wife were for the purpose of defrauding Hyman Freedman and hindering and delaying him in the collection of his judgment. It is conceded that they were made without consideration; in addition, there can be no doubt that, at least as far as the May 1957 transfers are concerned, the defendant was thereby rendered insolvent. Indeed, by the end of the year 1957, after the close-out of a joint bank account with the balance on deposit going to the wife, the husband was without assets of any kind except for his office equipment, subject to the chattel mortgage already referred to. Thus, as to the May 1957 transfers, the plaintiff has made out a prima facie case; they were presumptively fraudu-

5. At the conclusion of the trial the Court dismissed claims with respect to two cash transfers.

6. The funds were used to buy shares of stock in a corporation which owned the apartment house.

lent [7] under section 273 of the New York Debtor and Creditor Law [8]—this apart from any question of actual intent to defraud under section 276.[9] The wife, in meeting her burden of going forward, urges that these provisions of law are entirely inapplicable here. It is her contention, supported by the husband, that the securities here sought to be recovered were at all times her property, although registered in his name; [10] that they were purchased with her funds; that at no time did she ever make or intend to make a gift to her husband of the moneys which were either used to purchase the securities or deposited in bank accounts in his name. In sum, that he simply returned to her what always was hers. The facts upon which this plea is made are as follows:

The defendants were married in 1939. The wife testified that shortly before their marriage she informed her prospective husband that she was to receive a life income from her late father's estate as well as certain capital distributions; that it was customary in her family for husbands to manage family funds; that in like manner she wanted him, following their marriage, to manage her financial affairs; that after the marriage she did turn over to him the income and distributions derived from her father's estate and other sources; that the securities purchased or traded in by her husband in the various brokerage accounts in his name were all bought with those funds; that the bulk of bank deposits in his name likewise were the proceeds of moneys she turned over to him; that his professional income at all times was inadequate to permit investment or trading in stocks on his own account or for him to provide for the upkeep and maintenance of the family unit in accordance with their standard of living, to wit, at the rate of $15,000–$20,000 or more per year.

As to the chattel mortgage, it is claimed that shortly after their marriage the wife provided the cash to furnish and equip her husband's office when its location was changed to New York City. The substance of her testimony and that of her husband was that she did not make, nor intend, any gift of her patrimony; that he was just managing her property, money and affairs; that the securities in the various brokerage accounts and cash on deposit in savings banks and checking accounts, even though in his name, were her property.

There could, of course, be no contradiction of their testimony that upon their marriage they had an understanding such as they described. But the Court is not bound to accept the testimony of a witness simply because it is unchallenged by other oral testimony.[11] The spoken word, even though so unchallenged, may yet yield in the face of conduct or occurrences inconsistent with a claimed position. Indeed a witness' very demeanor may give dispute to the verity of his testimony. The issues are to be determined by the trier of the fact against the background of all the evidence and circumstances of a particular case.[12]

7. Feist v. Druckerman, 70 F.2d 333 (2d Cir. 1934) ; Ga Nun v. Palmer, 216 N.Y. 603, 111 N.E. 223 (1916).

8. "§ 273. CONVEYANCES BY INSOLVENT. Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration."

9. "§ 276. CONVEYANCE MADE WITH INTENT TO DEFRAUD. Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors."

10. At times during the course of the husband's trading in various stocks some certificates were in the street name, but at all times they were in brokerage accounts under his name.

11. Dyer v. MacDougall, 201 F.2d 265 (2d Cir. 1952).

12. See Quock Ting v. United States, 140 U.S. 417, 420–421, 11 S.Ct. 733, 35 L.

Upon all the evidence (however skeptical one might be that the husband's net professional income was in fact as little as he asserts—an average of $1,800 per annum over the twenty-one years of his married life), there can be no question that he and his wife lived beyond his income as a dentist; that the principal source of the funds necessary to carry on their mode of living was the wife; that from their marriage in 1939 until May 1957 she turned over to her husband a substantial portion of $250,000 derived from her father's estate and other sources, which was expended by the husband not only for family upkeep and maintenance, but also used by him to purchase securities in his own name and to an extent deposited in his personal bank accounts. The evidence also supports a finding that these substantial sums were so handed over to him on the basis of mutual confidence and affection. But the crucial issue still remains—whether these moneys were given to him without strings or restrictions of any kind, as the trustee contends, or, as the wife and husband contend, upon an express understanding that they were to remain hers, to be invested for her benefit or used for similar purposes—in short, they were not gifts, but were to be held by the husband in trust for her account.

■ I find, upon all the evidence and the circumstances of the case, that when the wife turned over to her husband funds derived from her father's estate and other sources, it was without restriction of any kind; in fine they were given to him to be used as his property and funds, whether for living expenses of the family, his business expenses, his personal purposes or for his personal investment; that he received complete rights of ownership and dominion over the funds and in fact exercised such rights for many years. The claim that these inheritance distributions were turned over upon an original understanding that

the husband was to manage them for his wife's benefit and that no gift was intended is negatived by their entire course of conduct and the circumstances, among others, that at the very time he bought securities with the funds and maintained brokerage accounts in his own name the wife also bought securities and had brokerage accounts in her own name; that whenever the husband and wife desired to treat property and funds separately they did so and maintained individual bank accounts. At one time following the receipt of a fairly substantial sum of money from her father's estate different accounts were opened —one in the name of the husband; another in the name of both as joint tenants with the right of survivorship; and two others in trust for their children. In their joint tax returns the husband and wife claimed dividend deduction credits to the extent permitted by law; if all the securities in his name belonged to the wife, there was no basis for any deduction by him. Although the wife claims she informed others that the securities in her husband's name belonged to her, the fact is that she never so informed her accountant. She was at all times fully aware that the securities in her husband's brokerage accounts were carried in his name and not in hers; that this pattern continued without change from their marriage until the transfers in 1957 when he closed out his brokerage accounts. As late as 1959 she signed an affidavit in which she swore that over a period of years she had given her husband substantial sums of money, but no claim was then asserted that these were not gifts.

The Court, after observing the husband and wife upon the witness stand, is satisfied that their contention that the securities and funds on deposit in his name were always hers and were never turned over to him absolutely and without restriction is born of the judgment entered against him in the patent suit

Ed. 501 (1891); Wynne v. Boone, 88 U.S.App.D.C. 363, 191 F.2d 220, 222

(1951); Munoz v. Wilson, 111 N.Y. 295, 300, 18 N.E. 855, 856–857 (1888).

and to avoid its consequences. The particular shares of stock delivered to the wife in May 1957 had long been in the husband's name in his brokerage accounts; without question he exercised full rights of ownership and dominion over them for many years and she fully acquiesced therein. The husband neither kept nor gave her any memorandum or record to indicate that the property was hers and not his. The chattel mortgage on his office equipment was executed by him eighteen years after the wife allegedly advanced funds for its purchase —and in this instance, too, only after entry of the interlocutory judgment in the infringement action.

What was said by the Supreme Court in Humes v. Scruggs, 94 U.S. 22, 27–28, 24 L.Ed. 51 (1876) seems particularly appropriate here:

"If the money which a married woman might have had secured to her own use is allowed to go into the business of her husband, and be mixed with his property, and is applied to the purchase of real estate for his advantage, or for the purpose of giving him credit in his business, and is thus used for a series of years, there being no specific agreement when the same is purchased that such real estate shall be the property of the wife, the same becomes the property of the husband for the purpose of paying his debts. He cannot retain it until bankruptcy occurs, and then convey it to his wife. Such conveyance is in fraud of the just claims of the creditors of the husband." (citing cases.)

Substantially the same rule was applied by Judge Rosenman in New York State in T. G. W. Realties, Inc. v. Long Island Bird Store, Inc., 151 Misc. 918, 922, 272 N.Y.S. 602, 607 (Sup.Ct.1934):

"Where a wife permits her husband to collect all of the income from her separate estate and use it for his own purposes, or to pay the household and family expenses therefrom, a gift of the income from the wife to the husband is presumed to have taken place. She cannot later demand that he account to her for it. She is not permitted to induce her husband to maintain a standard of living based upon her consent that he keep and use the income and then revoke that consent and insist that he return it."

Since there was no consideration for the transfer of the securities and the execution of the chattel mortgage in May 1957, and the husband at the time was rendered insolvent, the transactions come within the condemnation of section 273 of the New York Debtor and Creditor Law.[13] However, the Court finds the evidence does not sustain a claim of actual intent to defraud creditors under section 276 of the Debtor and Creditor Law. The wife, while she knew of the pending infringement action and the prospective judgment thereon, assumed that she had a right to the securities and property purchased with funds turned over to her husband, even though they had been given to him without restriction.

With respect to the cash turned over to the wife in February and March 1957, used for the purchase of an apartment by her, the evidence is not sufficient to set aside these transfers. It does not appear—at least plaintiff has not sustained his burden of proof on the whole case—that the husband was thereby rendered insolvent. The $7,200 was borrowed against securities in his brokerage account; he retained substantial unpledged securities therein and the office equipment was still free and clear of any encumbrances. There is no proof to establish that his then assets were insufficient to satisfy the judgment entered against the husband. Moreover, at the end of 1956 he had in his personal brokerage account, apart from other assets, almost 900 shares of stock of substantial value.

13. Feist v. Druckerman, 70 F.2d 333 (2d Cir. 1934).

202

As to the $908.64 drawn to the order of the wife to close out a joint checking account on November 21, 1957, the evidence is insufficient to establish that this was a transfer of moneys belonging to the husband. The account had been in existence since 1955 and it appears that most of the funds deposited therein came from her and that the husband was the source of very little of the money. In this circumstance there is no basis for declaring this a void transfer.

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law.

Submit decree, in accordance with the foregoing declaring the transfer of the securities on May 28, 1957 and the chattel mortgage dated the same day void, to contain appropriate provisions for its enforcement.