**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**FABRIC GARMENT CO., Inc., Mayflower Manufacturing Corp., Joseph Abrams and Murray Berman, Defendants-Appellants.**

**No. 462, Docket 30404.**

United States Court of Appeals
Second Circuit.

Argued June 24, 1966.

Decided Sept. 13, 1966.

See also, 2 Cir., 262 F.2d 131.

Louis A. Tepper, New York City (Gainsburg, Gottlieb, Levitan & Cole, New York City, with him on the brief), for appellants.

Louis S. Paige, Attorney, Department of Justice, Washington, D. C. (John W. Douglas, Asst. Atty. Gen. of United States; Alan S. Rosenthal, Attorney, De-

partment of Justice, Joseph P. Hoey, U. S. Atty., for Eastern District of New York, Brooklyn, N. Y., and Carl Golden, Asst. U. S. Atty., on the brief), for appellee.

Before MOORE, FRIENDLY and FEINBERG, Circuit Judges.

MOORE, Circuit Judge:

Fabric Garment Co., Inc. (Fabric), Mayflower Manufacturing Corp. (Mayflower), Joseph Abrams and Murray Berman appeal from a judgment for money damages entered against them in a conversion action tried without a jury in the District Court for the Eastern District of New York.

The plaintiff-appellee, the United States, through the New York Quartermaster Procurement Agency, during the course of 1951 had entered into four contracts with Fabric for the manufacture of Eisenhower military jackets. Under the terms of the contracts, the Government furnished Fabric with bolts of 18 oz. O. D. (Olive Drab) wool serge, out of which the jackets were to be made. Title to the material remained in the Government. Fabric was obliged to return to the Government all scrap and surplus material not returned in the form of acceptable jackets.

Fabric received a total of 578,147 linear yards of 55″ wide cloth and 141,336 linear yards of 56″ wide cloth, or, in all, the equivalent of 709,159 yards of 56″ wide cloth. Fabric returned 454,814 finished jackets, numerous sample jackets, and 89,238 lbs. of clippings. The clippings returned were the equivalent of 79,322.66 yards of 56″ cloth.

The gist of the Government's complaint is that Fabric did not return as jackets or as scrap all of the material furnished to it, but withheld and converted considerable amounts of the material to its own use. The complaint stated two claims: first, that Fabric, its president Hyman, and its secretary Abrams, had converted some 46,451 yards of the cloth; and second, that the same defendants, together with Mayflower and its president Murray Berman, had converted and sold approximately 19,000 yards of the same cloth, selling it to Alert Trading Corp. and David Q. Hartman.[1]

The trial court found after a trial which lasted over five weeks that appellants had failed to account for 39,822 yards of 56″ cloth,[2] of which the court estimated 23,408 yards to be in the form of yard goods worth $6.12 a yard, and 16,414 yards to be in the form of scrap, clippings, and goods damaged in weaving or manufacture, worth a total of $1,846.50. The court accordingly awarded

---

1. Alert Trading Corporation and David Q. Hartman were named as defendants in the complaint. The action was dismissed as against both on plaintiff's application.

The second claim as against Hyman was dismissed at the end of the plaintiff's case.

2. Computed as follows:

*yards of 56″ cloth*

| | | |
|---|---:|---:|
| furnished to Fabric | | 709,159 |
| used in jackets (paper test) | 570,864 | |
| returned as scrap | 79,323 | |
| allowance for missing chalk line | 10,000 | |
| excess material used in stamping | 7,500 | |
| allowance for contraction of wool | 1,000 | |
| unreturnable wool dust | 500 | |
| used in sample jackets | 150 | |
| | 669,337 | |
| unaccounted for | | 39,822 |

judgment against Fabric and Abrams[3] on the first claim in the amount of $145,-103.46, with interest from July 21, 1952. The court found that Fabric through Abrams had supplied Mayflower with 19,-551⅞ yards of Government serge which Mayflower in turn sold although its president Berman knew that the serge had been converted by Fabric. The court accordingly awarded judgment against Fabric, Abrams, Mayflower and Berman on the second claim, in the amount of $119,657.47 plus interest from August 20, 1951.

### 1. The Use of the Prior Criminal Convictions.

In 1954, Abrams, Hyman, Fabric, Mayflower, Berman, Alert Trading Corp. and Hartman were indicted for unlawfully selling approximately 19,000 yards of Government-owned wool serge, in violation of 18 U.S.C. § 641, and for conspiring to defraud the Government and to make false statements to the Government in violation of 18 U.S.C. § 1001. In a separate indictment, joined with the first for purposes of trial, Abrams, Hyman and Fabric were charged in eight counts with making false statements as to the disposition of Government-owned wool serge, in violation of 18 U.S.C. § 1001. Both indictments concerned the same wool serge furnished to Fabric by the New York Quartermaster Procurement Agency which is the subject of the present action for conversion. The jury acquitted Alert Trading Corp. and Hartman; the other defendants were convicted on all counts charged. On appeal, we reversed for lack of evidence all of the convictions of Hyman and the convictions of Fabric and Abrams on two of the eight false statement counts. All other convictions were affirmed. United States v. Fabric Garment Co., 262 F.2d 631 (2d Cir. 1958), cert. denied, 359 U.S. 989, 79 S.Ct. 1117, 3 L.Ed.2d 978 (1959).

In the present action for conversion, the Government moved for summary judgment on the grounds that many of the critical issues had been conclusively determined against the defendants in the criminal action. After careful analysis, the trial court denied the motion in part and granted it in part. It held that the 18 U.S.C. § 641 conviction did not conclusively determine that 19,000 yards of serge were converted by Fabric, Abrams, Mayflower and Berman, since the exact amount converted was not a necessary element of the criminal conviction and was not " 'distinctly put on issue and directly determined' in the criminal prosecution." Emich Motors Corp. v. General Motors Corp., 340 U.S. 558, 569, 71 S.Ct. 408, 414, 95 L.Ed. 534 (1951). However, the court held that the § 641 conviction determined that Fabric, Mayflower, Abrams and Berman unlawfully, willfully, and knowingly sold, conveyed and disposed of wool serge made under contract for the Government. The court also held that the § 1001 convictions determined that Fabric and Abrams unlawfully, willfully and knowingly made materially false and fraudulent statements as to the amounts of inventory on hand under certain contracts and as to whether they had returned as jackets or as scrap all the material furnished to them by the Government.

Appellants contend that the trial court erred in holding that the previous criminal convictions determined these issues for the purposes of this case. They maintain that the trial court should have applied the law of New York with respect to the effect of previous judgments, under which law previous criminal convictions are no more than prima facie evidence of the material facts involved. Schindler v. Royal Ins. Co., 258 N.Y. 310, 314, 179 N.E. 711, 80 A.L.R. 1142 (1932). We do not need to decide whether the *Schindler* rule, the weakness of which was recognized by the *Schindler* court itself, is still the law in New York, see Hin-

---

3. The court dismissed the first cause of action against Hyman on the merits.

chey v. Sellers, 7 N.Y.2d 287, 197 N.Y.S. 2d 129, 165 N.E.2d 156 (1959), since it is clear to us that the trial court properly applied federal rather than state law. We have previously held that in an action to enforce a federal claim, here the Government's rights in its own property, the effect to be given a prior federal judgment is a matter of federal law. See Zdanok v. Glidden Co., 327 F.2d 944, 956 (2d Cir.), cert. denied, 377 U.S. 934, 84 S. Ct. 1338, 12 L.Ed.2d 298 (1964).

 Under federal law, a prior criminal conviction will work an estoppel *in favor of the Government in a subsequent civil proceeding* with respect to "questions 'distinctly put in issue and directly determined' in the criminal prosecution. * * * In the case of a criminal conviction based on a jury verdict of guilty, issues which were essential to the verdict must be regarded as having been determined by the judgment." Emich Motors Corp. v. General Motors Corp., 340 U.S. 558, 569, 71 S.Ct. 408, 414, 95 L.Ed. 534 (1951); see Local 167, Int'l Bhd. of Teamsters etc. v. United States, 291 U.S. 293, 298, 54 S.Ct. 396, 78 L.Ed. 804 (1934). The trial court, after the careful examination of the record as required by *Emich*, correctly determined the collateral estoppel consequences of the previous convictions.

We find no merit in appellants' contention that no weight should be attributed to the previous convictions because of allegedly improper suppression by the Government of exculpatory evidence during the course of the criminal trial.

2. *The Paper Test, the Burden of Proof, and the Trial Court's Evaluation of the Evidence.*

 The principal issues at trial were the amount of material withheld by the defendants, and the nature of the material withheld—whether yard goods, or the much less valuable scrap.

The amount of material furnished by the Government was known. The amount returned by the defendants in the form of scrap was readily ascertainable, and the amount contained in sample jackets was not large enough to be significant. The most difficult problem was to ascertain the amount used or rendered unreturnable in the manufacture of the 454,-814 finished jackets. Some reference to Fabric's manufacturing process is necessary to an understanding of the nature of the proof at trial.

The Quartermaster Corps furnished Fabric with master patterns of the different parts to be produced in the manufacture of the jackets. There were 25 parts to each jacket. From copies of the master patterns, Fabric caused working patterns to be cut out of heavy paper cardboard. The cloth to be cut was laid out in 80 layers or lays, and working patterns were placed on the top lay with a view towards maximum use of cloth. The shape of the patterns was transposed to the top lay by drawing a piece of chalk around the working patterns. The cutter then cut out the parts, using an electric knife to cut through all eighty thicknesses at once, and attempting to follow the middle of the chalk line.

The Government set out to demonstrate the number of yards used in the manufacture of the jackets by the following "paper test." Ozalid reproductions were made from the master patterns which had been furnished to Fabric. Paper patterns for each part for each size were then cut in triplicate, using the Ozalid reproductions as a guide. The paper patterns were weighed under conditions designed to equalize their moisture content. Seven separate square yards of the same paper from which the paper patterns were made were also cut and weighed under similar conditions. The heaviest of the weights recorded for each part for each size were added up, and the total compared with the average weight of the square yards of the same paper, to determine how many square yards were used in the manufacture of a finished jacket of a given size—the theory being that

relative areas of material correspond to relative weights of the same material.[4]

Application of this test revealed that some 570,864.11 yards of 56″ material were used in the finished jackets. The District Court in computing the amounts used or rendered unreturnable during manufacture added to this figure allowances for error in missing the center of the chalk line on the top lay; for excess material consumed by use of a stamping process to make certain parts; for contraction of the wool during cutting; and for wool turned to dust or lint during cutting.[5]

Appellants contend that the "paper test" differed from conditions of manufacture so markedly that it should have been inadmissible. We disagree. That there were differences between the test and the process of manufacture was recognized by the trial court in making its allowances; but as was true of the similar paper test which this court held to have been properly admitted in the previous criminal trial,

" * * * the conditions of the test had a high degree of similarity to the process of manufacture which gave the ratio thus established substantial accuracy as a means to measure the area, in terms of yardage, of the serge going into a jacket."

262 F.2d 631, 637 (2d Cir. 1958). See also Lobel v. American Airlines, Inc., 205 F.2d 927 (2d Cir. 1953).

Nor do we find any error in the trial court's computation of the total amount of material withheld by appellants. Appellants urge that far more than the court allowed was rendered unusable during the process of manufacture, including portions of material cut off with the selvage;

defective cloth; and dust and lint produced by the electric knife. However, there was no reason why the appellant could not have returned the selvage-and-cloth strings and the defective cloth as scrap, as apparently required by the contract, see United States v. Fabric Garment Co., Inc., et al., 262 F.2d 631, 637 (2d Cir. 1958). Nor was the trial court required to accept in its entirety the testimony of appellants' witness Solinger that 5,000 yards were reduced to wool dust during the cutting. While there was no evidence directly contradicting this estimate, Solinger evidently did not base his computations on the width of any knife actually used by Fabric on the material in question; nor was there evidence to support his assumption that auxiliary cuts doubled the perimeter of the pattern, or that the knife totally reduced to dust its own width in wool. See Quock Ting v. United States, 140 U.S. 417, 420–422, 11 S.Ct. 733, 35 L.Ed. 501 (1891); Sheppard v. Maxwell, 346 F.2d 707, 726 (6th Cir. 1965), rev'd on other grounds, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Henry v. Field, 205 F.Supp. 197, 199 (S.D.N.Y.1962).

Appellants introduced evidence at trial from which a trier of fact could conclude that the perimeter of the working patterns used by Fabric was greater than the perimeter of the patterns used in the paper test, and that as a result more goods were used in the finished jackets than the paper test indicated. The trial court did not specifically allow for this difference, although some allowance may be implicit in his allowance for error in following the chalk line. However, failure to allow for this difference would not be prejudicial error in computations so nec-

---

4. E. g., the following computations established that 1.8290 yards of material were required to make a size 34 regular jacket:

$$\frac{\text{Weight in grams for all parts (in paper) for size 34 regular}}{\text{Average weight in grams for a square yard of paper}} =$$

$$\frac{308.29}{168.92} = \frac{\text{area in square yards of parts used to make size 34 regular}}{\text{area in square yards of one square yard}}$$

$$= 1.8290 = \frac{\text{area in square yards of parts used to make size 34 regular}}{1}$$

5. See fn. 2, supra.

essarily not susceptible of total precision since whatever error resulted appears to have been offset by factors not expressly taken into consideration by the trial court which, had they been expressly considered, would have cut in favor of the Government: for instance, the fact that in the paper test, the Government compared the heaviest figures recorded for the weights of the pattern parts with the average figures for the weights of a square yard of paper; and the fact that the Government included in its calculations of the weight of the pattern parts one part which was not used in the finished jacket and one part which was larger than that used in most jackets.

Appellants vigorously attack the trial court's determination of how much of the material withheld by appellants was scrap, and how much was in the form of yard goods. The trial court made its determination as follows. It compared the area of the lay required to produce all the different parts for a given size (based upon the testimony of Fabric's head cutter, William W. Schneider), with the area of the parts for that size (based upon the Government's paper test). Averaging ratios thus obtained for eight different sizes indicated that roughly 84% of the material contained in the lay was used to produce the pattern parts, and that roughly 16% of the material became scrap, clippings, or wool dust. The court increased the figures for the amount returned in the form of finished jackets, allowing for inaccuracies in following the chalk line and for excess material used in stamping rather than cutting, and estimated that roughly 13½% of the material furnished to Fabric, or some 95,736 yards, became scrap and clippings. Since 79,322 yards of scrap were returned to the Quartermaster, this meant that Fabric converted some 16,414 yards of scrap. The paper test figures, as adjusted by the court's allowances, indicated that Fabric had failed to account for 39,822 yards of material. The trial court subtracted from this amount the amount—16,414 yards—found to be in

the form of scrap, and concluded that 23,-408 yards of the material converted by appellants were in the form of yard goods.

■ Appellants maintain that in making this determination the trial court improperly placed upon them the burden of proving that the amounts withheld by Fabric took the form of scrap rather than yard goods. We do not agree. To the extent that the court required appellants to explain the size and nature of the damage once the Government had established both the fact of conversion and the approximate amount converted, this requirement was in accordance with the general principle which requires a bailee to account for goods delivered but not returned in accordance with the contract of bailment. E. g., Commercial Molasses Corp. v. New York Tank Barge Corp., 314 U.S. 104, 110–111, 62 S.Ct. 156, 86 L.Ed. 89 (1942); Aronette Mfg. Co. v. Capitol Piece Dye Works, Inc., 6 N.Y.2d 465, 469, 190 N.Y.S.2d 361, 364, 160 N.E.2d 842 (1959). The reason for the rule is present here: the bailee, having possession of the goods and working on them, is in a better position to explain what happened to them than is the bailor.

■ Nor is the computation of damages made by the trial court vulnerable as mere speculation. The trial court admitted that "the amount of unreturned goods not in the form of bolts or other usable yard goods is not subject to mathematical computation or certainty." No such certainty is required. The fact of conversion was manifest; the exact nature of the material converted could be ascertained only indirectly and with imprecision. The Supreme Court wrote in a similar case:

"Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In

such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise. * * * [T]he risk of the uncertainty should be thrown upon the wrongdoer instead of upon the injured party."

Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563, 51 S. Ct. 248, 250, 75 L.Ed. 544 (1931). See also Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 688, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946); Szekely v. Eagle Lion Films, 242 F.2d 266, 269 (2d Cir. 1957).

The allocation of the trial court of the material converted as between scrap and yard goods rested not upon speculation but upon reasonable inference. The court's result gains independent support from the evidence before the court on the second claim in the present action, which indicated that Abrams and Fabric, through Mayflower and Berman, sold over 19,000 yards of the material in question in the form of yard goods to Alert Trading Corp. and Hartman.

Appellants finally attack alleged inaccuracies in the trial court's computation of the amount of yard goods and the amount of scrap converted. Some of the inaccuracies alleged are readily refuted. The trial court's figures did take account of weaving damage, since the yardage furnished to Fabric was understated to reflect weaving damage, one-eighth of a yard being allowed for every defect found upon inspection. It is inferable that the trial court also took account of the cloth just inside the selvages, since the court used to compute the area of the lays not the area of the marker, but the length of the marker times a generous width of 55½″.

Other aspects of the court's computations are less easy to follow. It may be that the area of the paper parts in the Government paper test is less than the area of the working patterns used in the actual process of manufacture. It also appears that the court did not explicitly allow for defects which occurred during manufacture of the jackets at Fabric. Finally, it is unclear why the court based its computations on a figure of slightly less than 16%, where an arithmetical average of the ratios of lay area to paper pattern area would have been 16.5%, and an average, weighted according to the number of jackets in the different sizes, would have been higher still. However, as the trial court recognized, the problem was not one which lent itself to mathematical precision; and the imprecision produced by the factors just mentioned appears to have been roughly offset by factors making for imprecision in favor of appellants: the use of the heaviest paper parts, as compared with the average weights of square yards of paper, in the paper test; the inaccuracies in classification of the length and width of the bolts of material received by Fabric; the differences between the paper parts and the pattern parts actually used; and the like.

On balance, we are convinced that the trial court's careful findings of fact, made after a scrupulous evaluation of the evidence in a trial which lasted over five weeks and which produced a transcript of some 4,300 pages, are substantially accurate and should be upheld.

Affirmed.