**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Frank F. COLACURCIO,**
**Defendant-Appellant.**

**No. 74–2767.**

United States Court of Appeals,
Ninth Circuit.

April 7, 1975.

William A. Helsell, of Helsell, Paul, Fetterman, Todd & Hokanson (argued), Seattle, Wash., George W. Martin, Sr., of Martin, Niemi, Burch & Mentele, Seattle, Wash. (argued), for defendant-appellant.

Irwin Schwartz, Asst. U. S. Atty., Seattle, Wash. (argued), for plaintiff-appellee.

## OPINION

Before MERRILL and TRASK, Circuit Judges, and JAMESON,[*] District Judge.

JAMESON, District Judge:

Defendant-appellant appeals from his conviction, following a jury trial, of income tax evasion for the years 1967 and 1969 in violation of 26 U.S.C. § 7201.[1]

## BACKGROUND

The indictment charged the omissions of taxable income from appellant's tax returns as follows:

| Year | Reported | Claimed Corrected Income | Unreported Income |
|------|----------|--------------------------|-------------------|
| 1967 | $ 68,411.24 | $134,900.61 | $ 66,489.37 |
| 1968 | 85,375.36 | 117,480.31 | 32,104.95 |
| 1969 | 81,012.24 | 144,912.16 | 63,899.92 |
| Totals | $234,798.84 | $397,293.08 | $162,494.24 |

The net worth method[2] was used to prove the unreported income. The

---

[*] Honorable W. J. Jameson, United States Senior District Judge for the District of Montana, sitting by designation.

1. Appellant was acquitted on a count charging tax evasion in 1968.

2. "The net worth method seeks to derive taxable income in any given year by determining from all available evidence of assets and liabilities the increase (or decrease) in taxpayer's net worth over a twelve-month period, adding to it his nondeductible expenses for that year, and subtracting from the sum any amount attributable to nontaxable sources. For example, if a taxpayer begins the year with a net worth (cost of property less liabilities) of $40,000, ends it with $50,000, and has spent $7,500 during the year on living expenses, his receipts must have been at least $17,500. And if there is no likely nontaxable source of funds, such as gifts or inheritances, this set of facts constitutes strong circumstantial evidence that the receipts were taxable income." McGarry v. United States, 388 F.2d 862, 864 (1 Cir. 1967), cert. denied, 394 U.S. 921, 89 S.Ct. 1178, 22 L.Ed.2d 455 (1969).

Government established that the appellant earned most of his income during the years in question from concealed interests in various night clubs and taverns, interest on loans, and receipts from an unlawful bingo operation run by Charles Berger in Seattle.

In 1971 the appellant was found guilty of conspiring with Berger and Harry Hoffman to use the facilities of interstate commerce to promote the operation of bingo games contrary to the laws of the State of Washington and in violation of 18 U.S.C. § 1952.[3] The court made special findings of fact, including the following:

"Originally Berger operated one establishment and paid the defendant Colacurcio $1,000 per month. Thereafter, Berger was directed by Colacurcio to open an additional establishment across the street and was required to pay $1,000 per month on that establishment. A third one was later opened and the total payments to defendant Colacurcio were in excess of $3,000 per month. Berger testified he made payments to insure the operation of the clubs, otherwise they would be closed by the police."

Berger testified for the Government at the prior conspiracy trial, but was not called as a witness in this case. Rather, the Government, relying on the doctrine of collateral estoppel, submitted an instruction with respect to sums of money received by appellant during the years in question, based on testimony at the prior trial. Over the objection of the appellant, the court instructed the jury as follows during the Government's case in chief:

"Ladies and Gentlemen, the jury is instructed that it shall consider the following as a fact proven in these proceedings. The weight if any, to be attached to the fact is for you alone to decide.

"You are instructed that the defendant received the following sums of money from a Seattle businessman in payment stemming from that person's business operations in the City of Seattle:

| | |
|---|---|
| 1965 | $13,000 |
| 1966 | 24,000 |
| 1967 | 24,000 |
| 1968 | 36,000 |
| 1969 | 27,000 |

and that these payments have not previously been the subject of evidence in this trial.

"The court does not mean by this instruction to tell you that these payments did or did not constitute taxable income."

The total payments by Berger to appellant in each of the five years from 1965 through 1969 were not set forth in the special findings in the prior case. However, the information necessary to arrive at the figures given to the jury was contained in Berger's testimony. Berger testified further that it was his understanding that of each $1,100 payment to appellant, $1,000 was going to the Seattle police and $100 to appellant for handling the matter. This testimony was not mentioned in the court's instruction in this case.

The Government attempted to introduce appellant's tax returns for the years 1961–1965. The court initially ruled that none of the returns would be admitted.[4] Later, however, over appellant's objection, the court admitted appellant's 1965 return on the basis of Hamman v. United States, 340 F.2d 145,

---

3. Appellant was sentenced to three years imprisonment. In the present case the court imposed concurrent three-year sentences on each count, to run concurrently with the sentence in the first case. The prior conviction was affirmed after appellant's conviction in the court below. United States v. Colacurcio, 499 F.2d 1401 (9 Cir. 1974).

4. The Government sought to introduce appellant's tax returns for the years 1961–1965 for the purposes of (1) establishing understatement of income in the past; (2) proving that appellant had failed to file returns for 1961–1965 and did so only after he was investigated; and (3) corroborating the net worth of appellant as of 1966. The court initially refused to permit the tax returns to be admitted because of the undue prejudice to appellant which would arise from a showing that he had previously failed to file.

149 (9 Cir.) cert. denied, 380 U.S. 977, 85 S.Ct. 1339, 14 L.Ed.2d 271 (1965).

Testifying in his own behalf, appellant denied having been given any money by Berger in 1965 for his own use. He testified that the amounts received from Berger in 1965 were monies left with him for safekeeping while Berger was out of town. He estimated that he received approximately $20,000 for his own use from Berger in 1966, "twenty some thousand" in 1967, $25 or $26,000 in 1968 and "$15,000 or so" in 1969. Appellant testified that the sums received from Berger for his own use were included in the "miscellaneous income" on his tax returns.

Appellant testified further that he had honestly endeavored to pay income taxes on his earnings and that any tax deficiency was attributable to his inadvertent use of an improper income reporting method. Appellant kept personally a book showing income from sources which he "was unable to divulge to the bookkeeper". He recorded as "ins" all of his business receipts and as "outs" all of his business disbursements. At the end of each quarter he subtracted the "outs" from the "ins", carried the net amount forward to a new page and discarded the old page. At the end of each year, he gave the net total to the person who prepared his income tax returns, and this amount was reported as "miscellaneous income".

Based on his claim that his failure to report income was the result of inadvertence and bona fide mistake, appellant offered two instructions on "willfulness", to the effect that his acts in connection with the income tax return resulting from bona fide mistakes, negligence, carelessness, or honest misunderstanding could not be considered "willful" or support a conviction of income tax evasion. The court refused the offered instructions and gave its own instructions on willfulness.

In his charge to the jury, the court, over objection of appellant's counsel, repeated in substance the instruction given during the Government's case with respect to the payments by Berger.

Appellant contends that the court erred in (1) instructing the jury that appellant received specified sums of money from a Seattle businessman (Berger) during the years 1965–1969, (2) admitting appellant's 1965 income tax return, and (3) failing to expressly instruct the jury that mere mistake, inadvertence, carelessness or negligence would not justify a conviction.

## I. 1965–1969 RECEIPTS FROM BERGER

With respect to the court's instructions as to the amounts received by appellant from Berger, appellant argues that (1) collateral estoppel may not be applied in a criminal case against the defendant; and (2) in any event, the doctrine was improperly applied in this action since (a) the facts recited in the instruction were not essential to the court's conclusion in the prior action; (b) the facts were not "ultimate" but "evidentiary" facts in the prior action; (c) the instruction deprived appellant of his Sixth Amendment right of trial by jury and his right to be confronted with the witnesses against him; and (d) the instruction omitted significant portions of Berger's testimony and its repetition after appellant testified unfairly cast him as a liar.

### A. *Applicability of Collateral Estoppel in Criminal Cases*

As stated by this court in Pena-Cabanillas v. United States, 394 F.2d 785, 786 (1968):

"The doctrine of collateral estoppel is an aspect of the broader principle of res judicata, United States v. Marakar, 300 F.2d 513 (3 Cir. 1962), vacated on other grounds 370 U.S. 723, 82 S.Ct. 1573, 8 L.Ed.2d 803 . . . and a common statement of the doctrine is that where a question of fact essential to the judgment is actually litigated and determined by a valid and final judgment, the determination is conclusive between the parties in a subse-

quent action on a different cause of action. Hoag v. State of New Jersey, 356 U.S. 464, 470, 78 S.Ct. 829, 2 L.Ed.2d 913 . . . (1958)."

While the doctrine of collateral estoppel has been held applicable in criminal cases, *see* Sealfon v. United States, 332 U.S. 575, 578, 68 S.Ct. 237, 92 L.Ed. 180 (1948); United States v. Adams, 281 U.S. 202, 50 S.Ct. 269, 74 L.Ed. 807 (1930); Cosgrove v. United States, 224 F.2d 146, 150 (9 Cir. 1955),[5] it is not clear from the decided cases to what extent it may be applied against a defendant. As noted by the court in United States v. Rangel-Perez, 179 F.Supp. 619, 623 (S.D.Cal. 1959) following a thorough analysis of relevant case law: "The reported criminal cases in which the doctrine of collateral estoppel has been applied in the Federal courts are largely those in which the doctrine has been involved for the benefit of the defendant, by way of defense".[6] *See also* 9 A.L.R.3d 214.

The Government relies on *Rangel-Perez* and *Pena-Cabanillas* in support of its contention that collateral estoppel is applicable against a defendant in a criminal action. In both cases, the defendants were charged with illegally entering the United States in violation of 8 U.S.C. § 1326 after having been previously deported. Both defendants in prior cases had been found to be aliens. The issue was whether the prior determination of alienage precluded the defendants from again litigating their status. Holding collateral estoppel applicable, the court in *Rangel-Perez, supra* 179 F.Supp. at 625, stated:

"The wise public policy underlying the doctrine [to put an end to the litigation of a given subject matter, once the parties have had a full hearing and fair adjudication of the issue], and common-sense judicial administration as well, combine to advocate application of collateral estoppel against a defendant in a criminal case, at least as to certain issues, where such issues have been in fact litigated and *necessarily adjudicated* in a prior criminal case between the identical prosecutor and the identical accused. Issues as to status, for example, would seem most appropriate for application of the doctrine . . . ". (Emphasis added).

This court in *Pena-Cabanillas* adopted the reasoning of *Rangel-Perez* in concluding that the defendant's status as an alien was a proper subject for the application of collateral estoppel. Quoting from *Rangel-Perez* the court stressed:

" ' . . . it is equally beyond question that the accused is always entitled to have any prior proceeding carefully examined in order to determine surely whether a prior adjudication of alienage was made after a full and adequate hearing, and *was essential to a determination of the case*' ". 394 F.2d at 788. (Emphasis added).

Appellant argues that if *Rangel-Perez* and *Pena-Cabanillas* are interpreted to mean that the court may in-

---

5. *See also* Frank v. Mangum, 237 U.S. 309, 333–334, 35 S.Ct. 582, 589, 59 L.Ed. 969 (1915), where the Court, in affirming denial of a petition for a writ of habeas corpus, said in part: "It is a fundamental principle of jurisprudence, arising from the very nature of courts of justice and objects for which they are established, that a question of fact or of law distinctly put in issue and directly determined by a court of competent jurisdiction cannot afterwards be disputed between the same parties . . . . The principle is as applicable to the decisions of criminal courts as to those of civil jurisdiction." The last sentence was quoted with approval in Emich Motors v. General Motors, 340 U.S. 558, 568, 71 S.Ct. 408, 414, 95 L.Ed. 534 (1951), where it was held that a "prior criminal conviction may work an estoppel in favor of the Government in a subsequent civil proceeding".

6. In *Rangel-Perez*, the court recognized that the majority of the courts "lean toward acceptance of the view that the doctrine of collateral estoppel, while available to the accused against the Government is not available to the prosecutor in Federal criminal cases". *Id.* 179 F.Supp. at 625. The court noted that the only federal cases which directly discussed the problem (both by way of dicta) held that only the defendant can benefit from the application of the doctrine of collateral estoppel in criminal cases. United States v. DeAngelo, 138 F.2d 466 (3 Cir. 1943) and United States v. Carlisi, 32 F.Supp. 479 (E.D.N.Y.1940).

struct the jury on facts which have been directly and necessarily adjudicated in a prior trial without production of any further evidence, their holding would ignore the defendant's constitutional right to be confronted with the witnesses against him and his right to have all of the facts decided by the jury. We cannot agree. With respect to all facts which were essential to a determination of the charges against appellant in the 1971 conspiracy trial, the appellant had the opportunity to cross-examine all witnesses against him and was accorded his constitutional right to trial by jury.[7] While *Rangel-Perez* and *Pena-Cabanillas* are limited to the question of defendant's status, we conclude that the rationale of those cases is equally applicable to those facts actually decided which were essential to the judgment in the prior case.

### B. *Application of Collateral Estoppel Herein*

■ The crucial question is whether the facts upon which the Government relies were in fact decided and were essential to the judgment in the prior case. The requirements for collateral estoppel are set forth in 1B Moore's Federal Practice Para. 0.443[1]:

> "The issue to be concluded must be the same as that involved in the prior action. In the prior action, the issue must have been raised and litigated, and actually adjudged. The issue must have been material and relevant to the disposition of the prior action. *The determination made of the issue in the prior action must have been necessary and essential to the resulting judgment.*" (Emphasis added).

The offense charged in the 1971 action involved conspiracy to use facilities of interstate commerce to carry on illegal bingo games. Appellant admits that the *fact* of the Berger payments was material and relevant in deciding whether appellant was engaged in the alleged conspiracy, but argues that the specific *amounts* of the Berger payments were not essential and that proof of those amounts was not subject to the doctrine of collateral estoppel.

We agree. The *amounts* of the Berger payments were not significant in the prior action. Only the fact that appellant was receiving protection money from Berger with respect to the illegal bingo operations was necessary to establish appellant's involvement in the conspiracy.[8] Since the amount of the Berger payments was not a necessary element of the conviction in the prior case and was not "distinctly put in issue and directly determined", Frank v. Mangum, *supra* at 333–334, 35 S.Ct. at 590, it was not subject to collateral estoppel. *See* United States v. Fabric Garment Co., 366 F.2d 530, 533 (2 Cir. 1966).[9]

---

**7.** Barber v. Page, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968), upon which appellant relies, is distinguishable. There, a transcript of a witness's testimony at a preliminary hearing was introduced at the defendant's trial for armed robbery. In reversing the Supreme Court noted that, "A preliminary hearing is ordinarily a much less searching exploration into the merits of a case than a trial, simply because its function is the more limited one of determining whether probable cause exists to hold the accused for trial." *Id.* at 725, 88 S.Ct. at 1322. Here, the evidence sought to be introduced by way of collateral estoppel was established at a prior trial. The appellant does not suggest that his right to confront witnesses against him was in any way abridged in that trial.

**8.** Since appellant was attempting to establish that he was not involved in the conspiracy, he was not in a position to question the *amount* of the Berger payments. To do so would have been to concede the ultimate point, i. e., that he was being paid off by Berger.

**9.** In United States v. Fabric Garment Co., a civil action for conversion of wool serge, the Government relied on a prior conviction of conspiracy to defraud and make false statements. The court held that the conspiracy convictions determined that the defendants had made false and fraudulent statements, but noted that the district court had properly held that the prior action had not conclusively determined the amount of goods converted since the amount was not a necessary element of the criminal conviction and was not "distinctly put in issue and directly determined" in the conspiracy trial, citing Emich Motors v. General Motors, *supra*.

Moreover, as noted *supra,* after appellant had testified with respect to the Berger payments, the court in its charge to the jury repeated the instruction that appellant had received specified sums from a "Seattle businessman in payments stemming from that person's business operations in the City of Seattle". The figures contradicted appellant's figures, particularly with respect to the year 1965. As appellant argues, the discrepancy between his figures and those contained in the court's instructions may well have cast him as a liar.

Furthermore, the instruction did not include that portion of Berger's testimony in the conspiracy trial that appellant was to keep only $100 of each $1,100 paid, with $1,000 going to the Seattle police. In the prior action it was unnecessary for the court to consider whether the money Berger gave appellant was in turn held for Berger or given to some third party. It was an issue in this case. There was no direct evidence to contradict appellant's testimony that the money from Berger was not for his own use. It could, however, be inferred from the court's instruction that appellant was the intended recipient of the Berger payments and not merely a conduit through whom the money passed to another. The court's closing statement in the instruction that "the court does not mean by this instruction to tell you that these payments did or did not constitute taxable income" did not clarify the matter, particularly in view of the fact that counsel for the Government in his argu-

ment to the jury repeatedly stressed the fact that appellant had intentionally failed to report income in 1965, relying in large part on the court's instruction.[10]

## II. ADMISSION OF THE 1965 TAX RETURN

■ Appellant's 1965 income tax return was admitted on the theory that a fraudulent omission of income for a pre-indictment year was provable in support of the charge that appellant fraudulently omitted income from his returns during the indictment years. As stated by this court in Hamman v. United States, *supra* 340 F.2d at 149, "Understatement of income tax in prior years, without further evidence of willfulness is admissible to show intent."

In 1965 appellant reported $7,400 in miscellaneous income. The only evidence that appellant may have fraudulently omitted income was the court's instruction that appellant had received $13,000 from a Seattle businessman in 1965. The Government relied heavily on appellant's failure to report this income. The admissibility of the 1965 return and the instructions on the Berger payments were tied together. Given the impropriety of the instruction, it was error to admit the 1965 tax return for the purpose for which it was used.

The Government suggests that, "If the matter of the Berger payments was the sole evidence which reflects upon the defendant's credibility", there might be some merit in the contention that appel-

---

10. Counsel argued in part:

"In 1965 you have been instructed that the defendant received $13,000 in payments from the Seattle businessman. Those payments the Court instructed you continued into 1969. What do those payments stem from? Mr. Colacurcio testified that they were payments from Charles Berger which were proceeds from bingo games.

"I asked Mr. Colacurcio what he did that entitled him to receive these very substantial sums of income from 1965 through 1969 and his answer essentially was, 'I had some part in setting up these operations. I found the place for them and I found a board of directors for them and I helped get incorporated.'

"Yet he said that although the first operation was started with his assistance in 1965, 'None of the money that I received in 1965 was mine. It was all supposed to go to someone else.'

"Well, who was it supposed to go to. It was supposed to go to Tom Smith. Tom Smith, Mr. Colacurcio says, always received a lesser share of the proceeds from these bingo games than he did.

"I submit to you ladies and gentlemen, that that $13,000 in 1965 was Mr. Colacurcio's share for his services rendered, just as it was in 1966, 1967, 1968 and 1969."

lant was unfairly cast in the role of a liar, assuming he is correct on the law. It is argued, however, that gross inconsistencies in his trial testimony and prior depositions afforded the jury an ample basis to reject his claim of innocent error. In other words, the Government contends that for this reason any error was harmless.

It is true that there was other impeaching testimony. Unfortunately, however, the Government relied heavily on the improper instruction and 1965 tax return. We cannot escape the conclusion that this evidence was prejudicial to appellant and did not constitute harmless error.

### III. INSTRUCTIONS

██ Appellant's primary defense was that any deficiencies in his tax returns were the result of a mistaken belief that his method of recording income was proper. The instructions offered by appellant stressed the fact that willfulness required a showing of a bad purpose to evade the law and that bona fide mistake, negligence, carelessness or misunderstanding were not sufficient to support a conviction of income tax evasion. While the proffered instructions are a correct statement of the applicable law, we conclude that the instructions given by the court sufficiently apprised the jury of the state of mind that was required for conviction.[11]

Contrary to appellant's position, this court and other courts have held that "magic words" such as "bad purposes" or "evil motive" are not necessary as part of the willfulness instruction in cases of this nature. United States v. Hawk, 497 F.2d 365, 368 (9th Cir.), cert. denied, 419 U.S. 838, 95 S.Ct. 67, 42 L.Ed.2d 65 (1974); United States v. DiVarco, 484 F.2d 670, 674 (7 Cir. 1973), cert. denied, 415 U.S. 916, 94 S.Ct. 1412, 39 L.Ed.2d 470 (1974). The notion of the necessary *mens rea* can be conveyed without the

use of these shorthand terms. In its instructions the court stressed that the jury could not find the appellant guilty unless the evidence established beyond a reasonable doubt that he had acted willfully, i. e., that he had the specific intent to evade the taxes he was legally obligated to pay. The instructions adequately establish the nature of the *mens rea* necessary for conviction. Likewise they eliminate the possibility that the jury might find appellant guilty based on negligence, bona fide mistake, carelessness, or misunderstanding. *See* United ed States v. Shavin, 320 F.2d 308, 313 (7 Cir.), cert. denied, 375 U.S. 944, 84 S.Ct. 349, 11 L.Ed.2d 273 (1963); Loux v. United States, 389 F.2d 911, 921–922 (9 Cir.) cert. denied, 393 U.S. 867, 89 S.Ct. 151, 21 L.Ed.2d 135 (1968).

Reversed and remanded for a new trial.

11. Both the Government and the defendant offered additional instructions which were rejected by the court. Appellant argues that an isolated instruction defining "willfulness" was erroneous in that it failed to state that there

must be a showing of evil motive, purpose or interest. The instructions as a whole, however, were adequate and a correct statement of the applicable law.