ALBERT BARRASSO and MARION BARRASSO, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent SIMONE and MARY DE CAVALCANTE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Barrasso v. Commissioner
Docket Nos. 9432-74, 9877-74.
United States Tax Court
T.C. Memo 1978-432; 1978 Tax Ct. Memo LEXIS 83; 37 T.C.M. (CCH) 1783; T.C.M. (RIA) 78432; October 31, 1978, Filed; As Amended Bruce R. Sandles, for the petitioners in docket No. 9432-74. *84 Fred Randall and Richard H. Stein, for the petitioners in docket No. 9877-74. Marwin A. Batt and Joseph F. Maselli, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in and additions to tax against Albert Barrasso and Marion Barrasso for the years and in the amounts as follows: Additions to Tax, [1]
I.R.C. 1954 Year
Income Tax
Sec. 6653(b)
1965
$ 370,006.02
$ 185,003.01
1966
373,025.32
186,512.66
1967
371,082.68
185,541.34
1968
402,292.93
201,146.46
1969
389,270.66
194,635.33
Respondent determined deficiencies in and additions to tax against Simone De Davalcante and Mary De Cavalcante for the years [2] and in the amounts as follows: *85 Additions to Tax, [1]
I.R.C. 1954 Year
Income Tax
Sec. 6653(b)
1965
$ 387,383
$ 193,691
1966
394,004
197,002
1967
384,291
192,146
1968
423,471
211,736
1969
415,091
207,546
Some of the issues have been disposed of by agreement of the parties, leaving for decision: (1) Whether Simone De Cavalcante and Albert Barrasso are each collaterally estopped from denying that they supervised and controlled a gambling operation during the years 1965 through 1969 because of their convictions under 18 U.S.C. sec. 371 (1948) of conspiring to violate certain New Jersey statutes prohibiting operation of a lottery; (2) whether there was an underpayment of tax by each Simone De Cavalcante and Albert Barrasso in each of the years here in issue, a part of which was due to fraud; [3]
(3) whether the assessment and collection of any deficiencies from the Barrassos for each of the years 1965 through 1969 and for the De Cavalcantes for the year 1965 are barred by the statute of limitations; (4) whether Mr. Barrasso and Mr. *86 De Cavalcante each had unreported gambling income for each of the years here in issue and, if so, the amount thereof; (5) whether Mr. and Mrs. De Cavalcante had unreported income in 1968 with which they made investments in Elton Estates, a corporation, and in De Wolf Corporation and a deposit in their bank account; and (6) whether Marion Barrasso should be relieved of liability for each of the years here in issue as an innocent spouse under section 6013(e). The parties stipulated with respect to Mrs. De Cavalcante that she no longer contends that she should be relieved of tax liability as an innocent spouse and "also agrees that if respondent establishes that any part of the understatement of income for the years 1965, 1966, 1967, 1968 and 1969 is due to fraud, that she is liable for the additions to the tax under Section 6653(b) for the years 1965, *87 1966, 1967, 1968 and 1969." FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners Albert and Marion Barrasso, husband and wife, who resided in Bloomfield, New Jersey at the time of the filing of their petition in this case, filed joint Federal income tax returns for the calendar years 1965, 1966, 1967, 1968 and 1969. Petitioners Simone and Mary De Cavalcante, husband and wife, who resided in Princeton, New Jersey at the time of the filing of their petition in this case, filed joint Federal income tax returns for the calendar years 1965, 1966, 1967, 1968 and 1969. Albert Barrasso had sometime prior to the years here in issue been a horse trainer. During the years here in issue he considered himself to be retired and, other than doing some work in a bridal shop which was owned and operated by his wife, had no employment during the period 1965 through 1969 from which he reported any income on the tax returns he filed jointly with his wife. Mr. Barrasso had known Simone De Cavalcante for a number of years prior to 1965 and knew him throughout the period 1965 through 1969. During the years 1965 through 1969, Mr. De Cavalcante *88 was the primary owner and operator of Kenworth Corporation. He also owned a 50 percent interest in a corporation known as Controlled Heating Corporation. The offices of Kenworth Corporation were at 21 Michigan Avenue, Kenilworth, New Jersey. Both corporations were engaged in the heating and plumbing business. During the years 1965 through 1969, Mr. Barrasso quite often went to Mr. De Cavalcante's office at the Kenworth Corporation at 21 Michigan Avenue. During the years 1966 through 1969 he would go to the Kenilworth address four or five times a week and would occasionally call Mr. De Cavalcante at his office at Kenworth Corporation. At times Mr. Barrasso would drive Mr. De Cavalcante to various places. During 1968 and 1969, both the Federal Bureau of Investigation (FBI) and the Intelligence Division of the Internal Revenue Service had Mr. De Cavalcante and Mr. De Cavalcante's place of business at 21 Michigan Avenue, Kenilworth, under surveillance. The surveillance by the special agents of the Internal Revenue Service covered a period of at least from December 6, 1968 to December 1969. Also, during the latter part of 1968 through part of 1969 the FBI had a legal wire tap *89 placed on certain telephones that were being used in connection with an illegal numbers operation. During this period various other investigations of Mr. De Cavalcante and other individuals were also being conducted. During this period the special agent of the Internal Revenue Service had begun some investigation of Mr. De Cavalcante's bank accounts. On December 15, 1969, two indictments were returned against Mr. De Cavalcante and Mr. Barrasso and a number of other individuals by a Federal Grand Jury in and for the District of New Jersey charging Mr. De Cavalcante, Mr. Barrasso and others with violation of 18 U.S.C. sec. 371 (1948). When these indictments were returned, the special agent of the Internal Revenue Service ceased further investigation of Mr. De Cavalcante's tax returns and for this reason did not complete investigation of his bank accounts. The first of these indictments, No. 544-69, included in the parties charged Joseph Ippolito, Anthony De Pasque (a.k.a. Masher), Ralph Masciola, Nick Zarro, "Jo Jo" Ferrara, Fred Springer, Roberta Drake, Lulu Mae Brown and others. This indictment charged in part as follows: 1.From on or about the 1st *90 day of January, 1965, and continuously thereafter, up to and including the date of the filing of this Indictment, in the District of New Jersey and elsewhere, SAMUEL RIZZO DE CAVALCANTE, * * * JOSEPH IPPOLITO, ANTHONY DE PASQUE aka MASHER, ALESSIO BARRASSO, * * * the defendants herein, unlawfully, wilfully and knowingly did combine, conspire, confederate and agree together and with each other, and with divers other persons whose names are to the Grand Jury unknown, to commit offenses against the United States, to wit, to violate Section 1952 of Title 18, United States Code. 2. It was a part of the said conspiracy that the defendants did use and cause to be used a facility in interstate commerce; to wit, a telephone between the State of New Jersey and Troy, New York, and elsewhere; with intent to promote, manage, carry on and facilitate the promotion, management, and carrying on of an unlawful activity, said unlawful activity being a business enterprise involving gambling in violation of the Penal Law of the State of New Jersey, to wit "lottery" in violation of Section 3, Subtitle 121, Title 2A, New Jersey Statutes Annotated (2A:121-3, N.J.S.A); and thereafter, the defendants did *91 perform, and attempt to perform acts facilitating the promotion, management and carrying on of said unlawful activity. 3. It was further a part of said conspiracy that the defendants did travel and cause others to travel in interstate commerce; to wit, between the State of New Jersey and Troy, New York, and elsewhere; with intent to promote, manage, carry on and facilitate the promotion, management and carrying on of an unlawful activity; said unlawful activity being a business enterprise involving gambling, in the violation of the Penal Law of the State of New Jersey, to wit, "lottery" in violation of Section 3, Subtitle 121, Title 2A, New Jersey Statutes Annotated (2A:121-3, N.J.S.A.) and thereafter the defendants did perform and attempt to perform acts facilitating the promotion, management and carrying on of said unlawful activity. 4. Among the means by which the defendants did carry out the aforesaid conspiracy were the following: A. The defendants SAMUEL RIZZO DE CAVALCANTE and ALESSIO BARRASSO did supervise and control the business of accepting wagers and bets. B. The defendants JOSEPH IPPOLITO, ANTHONY DE PASQUE aka MASHER, CHARLES MAJURI, NICK ZARRO and RALPH MASCIOLA *92 did supervise the daily operation of the controllers who accepted numbers wagers and bets from numbers writers. * * *
OVERT ACTS
In pursuance of the said conspiracy and to effect the objects thereof, in the District of New Jersey and elsewhere, the defendants committed the following overt acts, among others: * * *
2. On or about December 15, 1968, SAMUEL RIZZO DE CAVALCANTE and ALESSIO BARRASSO met together at 21 Michigan Avenue, Kenilworth, New Jersey. * * *
All in violation of Title 18, United States Code, Section 371. The other indictment, No. 545-69, which also included in addition to Mr. De Cavalcante and Mr. Barrasso Messrs. Ippolito, De Pasque, Ferrara, and Springer and Ms. Drake, charged in part as follows: COUNT ONE
1. From on or about the 1st day of January, 1965, and continuously thereafter, up to and including the date of the filing of this Indictment, in the District of New Jersey and elsewhere, SAMUEL RIZZO DE CAVALCANTE, CHARLES MAJURI, JOSEPH IPPOLITO, ANTHONY DE PASQUE aka MASHER, ALESSIO BARRASSO, * * * defendants herein, unlawfully, wilfully and knowingly did combine, conspire, confederate and agree together *93 and with each other and with divers other persons whose names are to the Grand Jury unknown, to commit offenses against the United States, to wit, to violate Section 1952 of Title 18, United States Code. 2. It was a part of the said conspiracy that the defendants did use and cause to be used a facility in interstate commerce; to wit, a telephone between the State of New Jersey and Troy, New York, and elsewhere; with intent to promote, manage, carry on and facilitate the promotion, management, and carrying on of an unlawful activity, said unlawful activity being a business enterprise involving gambling in violation of the Penal Law of the State of New Jersey, to wit, "lottery" in violation of Section 3, Subtitle 121, Title 2A, New Jersey Statutes Annotated (2A:121-3, N.J.S.A.); and thereafter, the defendants did perform, and attempt to perform acts facilitating the promotion, management and carrying on of said unlawful activity. 3. It was further a part of said conspiracy that the defendants did travel and cause others to travel in interstate commerce; to wit, between the State of New Jersey and Troy, New York, and elsewhere; with intent to promote, manage, carry on and facilitate *94 the promotion, management and carrying on of an unlawful activity; said unlawful activity being a business enterprise involving gambling, in the violation of the Penal Law of the State of New Jersey, to wit "lottery" in violation of Section 3, Subtitle 121, Title 2A, New Jersey Statutes Annotated (2A:121-3, N.J.S.A.) and thereafter the defendants did perform and attempt to perform acts facilitating the promotion, management and carrying on of said unlawful activity. 4. Among the means by which the defendants did carry out the aforesaid conspiracy were the following: A. The defendants SAMUEL RIZZO DE CAVALCANTE and ALESSIO BARRASSO did supervise and control the business of accepting wagers and bets. B. The defendants JOSEPH IPPOLITO, ANTHONY DE PASQUE aka MASHER, CHARLES MAJURI, NICK ZARRO and RALPH MASCIOLA did supervise the daily operation of the controllers who accepted numbers wagers and bets from numbers writers. Initially, both Mr. De Cavalcante and Mr. Barrasso pleaded not guilty to each of the above indictments.On October 23, 1970, Mr. Barrasso withdrew his not guilty plea as to Count One of Indictment No. 545-69 and pleaded guilty to that count. At the hearing on *95 October 23, 1970, Mr. Barrasso was represented by an attorney, Samuel D. Bozza.Before accepting Mr. Barrasso's plea of guilty, the United States District Court judge before whom the case was pending asked Mr. Barrasso certain questions with respect to his health, whether he had consulted with his attorney and had the indictment explained to him, and whether he understood the charges in the indictment, and Mr. Barrasso answered "Yes." Following the asking of these questions, the court read to Mr. Barrasso Count One of the indictment and then asked Mr. Barrasso if it was that indictment to which he desired to plead guilty and Mr. Barrasso answered "Yes, Sir." On March 15, 1971, sentence was imposed on Mr. Barrasso and on March 23, 1971, the following judgment and commitment was entered by the United States District Court for the District of New Jersey: On this 15th day of March, 1971, came the attorney for the government and the defendant appeared in person and by Samuel D. Bozza, counsel IT IS ADJUDGED that the defendant upon his plea of guilty, and the court being satisfied there is a factual basis for the plea has been convicted of the offense of conspiring to use and cause *96 to be used in interstate commerce telephone to carry on gambling and to travel and cause others to travel in interstate commerce to carry on enterprise involving gambling as charged in Count 1 and the court having asked the defendant whether he has anything to say why judgment should not be pronounced, and no sufficient cause to the contrary being shown or appearing to the Court, IT IS ADJUDGED that the defendant is guilty as charged and convicted. IT IS ADJUDGED that the defendant is hereby committed to the custody of the Attorney General or his authorized representative for imprisonment for a period of Five (5) years and that he do pay a fine of $ 5,000.00, on Count 1.[Footnotes omitted.] In this same order all counts other than Count One of the indictment were dismissed. At the hearing on March 15, 1971, Indictment No. 544-69 was dismissed as to Mr. Barrasso. At a hearing in the United States District Court for the District of New Jersey held on January 15, 1971, Mr. De Cavalcante withdrew his plea of not guilty to the charges against him in Indictment No. 544-69 and entered a plea of guilty. Before accepting the guilty plea the Court addressed certain questions to Mr. *97 De Cavalcante with respect to his physical and mental health and his understanding of the charges in the indictment. The court asked Mr. De Cavalcante whether he was acquainted with the charges in the indictment and had reviewed them with his attorney, Mr. Ronald A. Brown, and Mr. De Cavalcante answered "Yes." The presiding judge then read the portions of Indictment No. 544-69 pertinent to Mr. De Cavalcante and asked Mr. De Cavalcante if it was that indictment to which he desired to withdraw his plea of not guilty and enter a guilty plea and Mr. De Cavalcante answered "Yes, sir." The court then asked Mr. De Cavalcante whether the matters charged therein were matters performed or caused to be performed by him, and Mr. De Cavalcante stated that he did not understand. The question was repeated and Mr. De Cavalcante's attorney explained the question to Mr. De Cavalcante as being whether he did, as the indictment said, "supervise them," and Mr. De Cavalcante answered "I plead guilty." At the time Mr. De Cavalcante entered his guilty plea he was in the custody of the United States Marshall after having been convicted on an unrelated criminal charge. An appeal from that conviction was *98 pending in the United States Court of Appeals for the Third Circuit. The argument on the appeal had been held on December 10, 1970, but no action had been taken with respect to the appeal by the circuit court. On March 10, 1971, the circuit court reversed Mr. De Cavalcante's conviction on the unrelated criminal charge. On March 15, 1971, Mr. De Cavalcante moved to have his guilty plea withdrawn and to enter a plea of not guilty to the charges in Indictment No. 544-69. A hearing was held on that date in the United States District Court for the District of New Jersey on the application of Mr. De Cavalcante to withdraw his guilty plea and reinstate his plea of not guilty. After the conclusion of the hearing, including testimony by Mr. De Cavalcante and Mr. Samuel D. Bozza, the court denied Mr. De Cavalcante's motion to withdraw his guilty plea and shortly thereafter entered findings of fact and conclusions of law and an order denying the motion. In his findings of fact the District Court judge found that at the time of entering his guilty plea Mr. De Cavalcante was represented by experienced and able counsel who advised him that he would not represent him if the guilty plea was *99 being made other than because Mr. De Cavalcante was guilty as charged. The findings further stated that at the time of entering the plea Mr. De Cavalcante knew that he had an appeal pending from his prior conviction and that if the conviction were reversed the sentence imposed thereon would fall. The court further found that Mr. De Cavalcante was truthful when he stated that the plea was not induced by promises or threats or any other understanding concerning his sentence and that he made the plea voluntarily of his own volition. The court found that Mr. De Cavalcante had been informed of the Government's intent to file a notification to treat Mr. De Cavalcante as a dangerous public offender because of his prior conviction and that if Mr. De Cavalcante pleaded guilty the Government would recommend a concurrent sentence and not oppose the imposition of a suspended sentence if the court were inclined to grant it. The court further found that Mr. De Cavalcante was told on several occasions that the Government could not guarantee him what sentence would be imposed by the court since that matter was solely a matter for the court, but would not oppose a suspended sentence if the court *100 were inclined to grant it. The court further found that Mr. De Cavalcante was concerned about adverse publicity and the Government had represented to him that the Government would not issue any press releases about his guilty plea and that Mr. De Cavalcante was given an opportunity to speak with his attorney in private and did so for approximately 15 minutes before he advised the Government attorney that he would plead guilty.The court finally found that the Government's witnesses had been dismissed and that the Government had no knowledge of the whereabouts of one of its key witnesses. Upon denying Mr. De Cavalcante's motion to withdraw his guilty plea on March 15, 1971, the court imposed sentence on Mr. De Cavalcante, and on March 23, 1971, filed an order of judgment and commitment which was as follows: On this 15th day of March, 1971 came the attorney for the government and the defendant appeared in person and by Raymond A. Brown, counsel IT IS ADJUDGED that the defendant upon his plea of guilty, and the court being satisfied there is a factual basis for the plea has been convicted of the offense of conspiring to use and cause to be used in interstate commerce a telephone *101 to carry on enterprise involving gambling and to travel and cause others to travel in interstate commerce to carry on enterprise involving gambling as charged and the court having asked the defendant whether he has anything to say why judgment should not be pronounced, and no sufficient cause to the contrary being shown or appearing to the Court, IT IS ADJUDGED that the defendant is guilty as charged and convicted. IT IS ADJUDGED that the defendant is hereby committed to the custody of the Attorney General or his authorized representative for imprisonment for a period of five (5) years and that he do pay a fine of $ 10,000.00. [Footnotes omitted.] On March 15, on the motion of the Government, Indictment No. 545-69 was dismissed as to Mr. De Cavalcante. At the hearing on March 15, 1971, after the court had stated that it would deny the motion of Mr. De Cavalcante to withdraw his guilty plea and did not believe that Mr. DeCavalcante would have pleaded guilty if he were not guilty, both Mr. De Cavalcante and his attorney addressed the court with respect to the sentence to be imposed on Mr. De Cavalcante. The court, in explaining why it was imposing the maximum sentence on Mr. *102 De Cavalcante for the offense with which he was charged stated in part: Having pled guilty to Indictment Number 544-69, in effect, Mr. DeCavalcante pled guilty to supervising and controlling the entire operation which gave rise to the balance of the, one can call it the ladder or the triangle or the pyramid, but all that went on beyond it, and I don't think it should be coming as any surprise to anyone who has spent the day in this courtroom today to know that I have made a very conscious endeavor to try to equate the responsibility with the sentence * * *. The order of the United States District Court for the District of New Jersey denying Mr. De Cavalcante's motion to withdraw his plea of guilty and enter a plea of not guilty was appealed to the United States Court of Appeals for the Third Circuit. On September 10, 1971, the Circuit Court of Appeals entered an order affirming the order of the United States District Court in a per curiam opinion which included a full recitation of the findings of the District Court. In this per curiam opinion the Circuit Court of Appeals stated that the record adequately supported the District Court's findings and, although within that circuit *103 the withdrawal of a guilty plea before sentence was liberally allowed, the fact that prosecution witnesses had dispersed and that the whereabouts of one key witness were unknown had caused the District Court judge to conclude that it would be prejudicial and unfair to the prosecution to permit withdrawal of the plea. The opinion further stated that it was within the allowable judicial discretion to view the present unchallenged indication of significant potential prejudice to the prosecution as decisive in disallowing a withdrawal of the plea. The surveillance of Mr. De Cavalcante conducted by the special agents of the Internal Revenue Service showed that automobiles registered in the names of three of the other individuals included in the indictment to which Mr. De Cavalcante pleaded guilty and the indictment to which Mr. Barrasso pleaded guilty were present on several occasions during the period from early December 1968 to December 1969 at the office of Kenworth Corporation at 21 Michigan Avenue, Kenilworth, New Jersey, and that on some occasions Mr. De Cavalcante and Mr. Barrasso were seen with the individuals who drove the cars to the Kenworth Corporation office and were seen *104 accompanying these individuals to other places, particularly to a restaurant near the offices of Kenworth Corporation known as Ange and Min's. Mr. Anthony De Pasque, one of the individuals named in Indictment No. 544-69 and Indictment No. 545-69 and who also entered a plea of guilty with respect to Indictment No. 544-69, began working around the middle of 1968 with a gambling operation in which a number of other people involved in the two indictments worked. Mr. De Pasque knew all the other individuals named in the indictments and knew the activities of a number of them with respect to the gambling operation in which he worked. Mr. De Pasque worked with the operation from mid-1968 until about mid-December of 1969 when the indictments were returned. He worked in the office of the operation and took the reports from the individuals referred to as "sitters," to whom bets were called in by the writers, and tallied them up each day. Mr. De Pasque also knew that Mr. Ippolito worked for the operation in a capacity he referred to as a "street" man. A number of the individuals named in the indictment to which Mr. De Pasque pleaded guilty were "sitters" and writers in connection with *105 the operation. Mr. De Pasque had known Mr. Barrasso for a number of years prior to 1965 since they were from the same neighborhood. He has known Mr. De Cavalcante since 1968.During the period 1968 and 1969 he at times would have dinner or coffee with Mr. De Cavalcante and Mr. Barrasso or one of them at Ange and Min's. This would be when Mr. De Pasque was meeting a Mr. Louie Luciano and Mr. Luciano would be with Mr. De Cavalcante and Mr. Barrasso or one of them in Ange and Min's. Although Mr. De Pasque did not begin working for the gambling operation until mid-1968, from the facts of the setup and the way it was operating he knew it had been operating for some period of time when he became involved, but did not know how long. Mr. De Pasque daily reported with respect to the gambling operation to Mr. Louie Luciano and on occasion he was present when Mr. Ippolito reported to Mr. Luciano. Mr. Luciano was very secretive with Mr. De Pasque and Mr. De Pasque knew nothing with respect to Mr. Luciano's activities beyond that he reported the office work of the lottery operation to him. Mr. De Pasque had known Mr. Luciano for 25 or 30 years prior to Mr. Luciano's death and knew him as *106 a bookmaker running various forms of gambling activities including card games and dice games. While Mr. De Pasque worked for the operation which was the basis of the charges of indictments 544-69 and 545-69, he knew the people who reported to him and he knew that some of them had been working in the operation prior to the time he came with the operation. He also knew a few of the workers that he replaced. Generally, an individual working in the operation merely knew the person above him and did not know who was above the person he reported to. A writer would know the "sitter" he reported to, the "sitter" would know the office man he reported to, but no one knew whether the person above him reported to someone higher up in the operation. An agent of respondent listened to tapes of legal wire taps on telephones of two "sitters" who were named in Indictment No. 544-69. The period covered by the tapes to which he listened was October 15 through November 7, 1969. The tapes showed that reports came in to these "sitters" from 47 writers and that the "sitters" called their daily work in the office of the operation. From listening to these tapes the agent computed the daily average *107 ribbon work for this period as $ 4,358.56. In addition there was reported so-called "steady" work which involved the placing of a standing bet with a daily average amount of $ 1,742.55 during this period. Adding these two figures together, the agent computed a total daily average receipts by the operation for the 57-day period of $ 6,101.11. Based on the information the agent received from an expert in the numbers operation who also was a witness at the trial of this case, the agent determined the number of dayson which bets could be taken in each of the years 1965 through 1969, multiplied the figures so determined by the daily average amount of bets shown for the 57-day period and on this basis determined yearly receipts. Further relying on the information he obtained from the expert in gambling, he determined that commissions and salaries to "writers," "sitters," and office personnel and pay-outs on bets totaled 70 percent of the amount of the receipts and that 30 percent remained for profit to the supervisors, controllers or owners of the operation. On the basis of this information the revenue agent determined that 30 percent of the amount he figured in each year as receipts *108 of the operation was income to Mr. De Cavalcante. He also determined that 30 percent was income to Mr. Barrasso and, although not involved in this case, that 30 percent was income to Mr. De Pasque. Mr. and Mrs. Barrasso on their joint Federal income tax returns for the calendar years 1965 through 1969 reported gross incomes of $ 2,170, $ 5,190, $ 5,160, $ 5,613.90 and $ 3,944, respectively. In 1967 Mr. Barrasso purchased stock for $ 9,317 and sold it in 1969 for $ 10,000. Mrs. Barrasso did not know and made no effort to determine the daily activities of her husband or to find out what his income was. De Wolf Corporation was incorporated as a New Jersey corporation on June 12, 1967. This corporation was originally organized by Mr. Laurence Wolfson. Mr. Wolfson was also the owner of the 50 percent stock interest in Controlled Heating Corporation which was not owned by Mr. De Cavalcante.In 1968 Mr. Wolfson transferred a one-half interest in De Wolf Corporation to Mr. De Cavalcante. Starting in late 1967 and continuing through a part of 1968, certain checks drawn to Mr. De Cavalcante by Controlled Heating Corporation were endorsed by Mr. De Cavalcante but deposited in Mr. *109 Wolfson's account. Shortly after the transfer to him of one-half the stock in De Wolf Corporation, Mr. De Cavalcante used this stock as security for a loan of $ 45,000 made to a corporation, Elton Estates. Mr. Wolfson had previously acquired a 60 percent stock interest in Elton Estates and in 1968 he transferred onehalf of his 60 percent interest to Mr. De Cavalcante. Sometime prior to March 16, 1970, Mrs. Mary De Cavalcante made an initial capital investment in Elton Estates of $ 11,000. There was no written agreement between Mr. De Cavalcante and Mr. Wolfson with respect to their respective interests in Controlled Heating Corporation, De Wolf Corporation or Elton Estates. Mr. and Mrs. De Cavalcante's joint Federal income tax returns for the years 1965 through 1969 reported income from salaries and wages, certain interest income and income from other listed business interests, but reported no income from gambling. All the income reported for the period 1965 through 1969 on Mr. and Mrs. Barrasso's tax returns was from salaries and wages or interest, with the exception of the samall gain reported in 1969 from the sale of stock. Respondent in his notice of deficiency to Mr. *110 and Mrs. De Cavalcante increased their reported income for the years 1965 through 1969 by the amounts of $ 533,044.33, $ 562,763.41, $ 561,969.67, $ 514,556.50 and $ 541,439, respectively, as net wagering income. For the years 1965 through 1969 respondent in his notice of deficiency to Mr. and Mrs. Barrasso increased reported income by wagering income of $ 571,064, $ 572,894, $ 569,234, $ 572,894 and $ 545,439 for the years 1965 through 1969, respectively. [4] In each instance the amount represented for each year 30 percent of the computed gross wagering income from a lottery operation, the income of which the agent had determined from various tapes relating to the lottery operation which formed the basis of the charges in indictments 544-69 and 545-69. At least one reference to"Sam" and "Barr" was made on the tapes to which the agent listened. Respondent in addition increased Mr. De Cavalcante's reported income for 1968 by $ 2,362.50 which *111 represented a deposit by Mr. De Cavalcante of a check drawn to him by Mr. Wolfson and also increased his income by $ 32,100, stated to reflect the purchase of an investment in Elton Estates, and $ 13,625, stated to represent the purchase of an interest in De Wolf Corporation. OPINION Respondent initially takes the position that both Mr. De Cavalcante and Mr. Barrasso are collaterally estopped from denying that they supervised and controlled a gambling operation during each of the years 1965 through 1969 because of their convictions of conspiracy under 18 U.S.C. sec. 371 (1948) to violate certain New Jersey Statutes prohibiting lotteries. The record shows that Mr. De Cavalcante and Mr. Barrasso each pleaded guilty to a charge that he and a number of other persons conspired to violate certain New Jersey Statutes prohibiting lotteries by using the telephone and by traveling in interstate commerce with intent to promote, manage, carry on and facilitate the promotion, managing and carrying on of an unlawful business enterprise involving gambling. The indictment further alleged that the means by which Mr. De Cavalcante and Mr. Barrasso carried out the conspiracy *112 was that they"did supervise and control the business of accepting wagers and bets." We have held that if otherwise applicable a conviction on a plea of guilty collaterally estops the person so convicted to the same extent as a conviction after a trial on the merits. Arctic Ice Cream Co. v. Commissioner,43 T.C. 68, 75 (1965). We have further held that the United States is a party privy with the Commissioner of Internal Revenue so that a conviction of an individual in a criminal case brought by the United States can give rise to collateral estoppel against that individual when he is the petitioner in this Court. See Amos v. Commissioner,43 T.C. 50 (1965), affd. 360 F.2d 358 (4th Cir. 1965). However, as discussed in detail in Considine v. Commissioner,68 T.C. 52 (1977), and United States v. Colacurcio,514 F.2d 1, 6 (9th Cir. 1975), great care must be taken in the second case that a taxpayer be estopped from denying *113 only those facts essential to the conviction in the first case. The case of United States v. Colacurcio,supra, involved a contention by the Government in a case involving criminal tax evasion under section 7201 that the conviction of Mr. Colacurico on a charge of conspiring with two other people to use the facilities of interstate commerce to promote bingo games contrary to state law and in violation of 18 U.S.C. sec. 1952 (1948) collaterally estopped him from denying receiving specific sums of money from another individual. The District Court had agreed with the Government's position with respect to the payments, but the Circuit Court reversed, pointing out that the amount of payments was not significant in the prior action -- that the issue in the prior action was whether Mr. Colacurcio was involved in the conspiracy with respect to the illegal bingo operation. The court stated that while the fact that he was receiving protection money might be necessary to establish Mr. Colacurcio's involvement, the amount of payments was in no way necessary to the conviction and was not specifically put in issue and specifically determined. *114 In the instant case we have an even more difficult situation because there was no trial to determine precisely what was put in issue. For this reason we consider it necessary to limit any collateral estoppel to the facts, the proof of which would have been absolutely necessary in order to obtain a conviction of Mr. De Cavalcante and Mr. Barrasso under the charges to which each plead guilty. We will list the facts which respondent contends Mr. De Cavalcante and Mr. Barrasso are collaterally estopped to deny and comment with respect to each such item. First, respondent contends that Mr. De Cavalcante and Mr. Barrasso are estopped to deny that they were not supervisors and controllers of a lottery operation during the entire period January 1, 1965, through December 15, 1969, the date of the indictment. In our view, respondent's position is incorrect. In the first place, the cases on conspiracy are clear that in order to show that an individual is guilty of conspiring to commit a criminal act it is necessary only to show that he was a participant at sometime prior to the completion of the conspiracy but not that he was a participant throughout the conspiracy. United States v. Cerrito,413 F.2d 1270 (7th Cir. 1969); *115 United States v. Brasseaux,509 F.2d 157 (5th Cir. 1975). Therefore, the convictions of Mr. De Cavalcante and Mr. Barrasso do not estop either of them from showing that they were not engaged in a conspiracy in connection with a lottery operation during the entire period alleged in the indictments, but merely estops them to deny that at sometime during that period they were so engaged. [5]
*116 Furthermore, it is equally clear that to obtain a conviction under 18 U.S.C. sec. 371 (1948) it is not necessary to demonstrate that the conspirators committed the acts which were the object of the conspiracy. Also, it is not necessary to substantiate each of the overt acts alleged in the indictments. The prosecution must demonstrate only an unlawful agreement and at least one independent act in furtherance of the agreement by each conspirator. United States v. Williams,474 F.2d 1047 (5th Cir. 1973). Considering the facts essential to the judgment in a conspiracy case, we conclude that Mr. De Cavalcante and Mr. Barrasso are each collaterally estopped only to deny that they conspired with each other and some of the other individuals named in the indictments to violate New Jersey gambling laws.
Because of the narrow view we take of the application of collateral estoppel in this case we deem it necessary for respondent, in order to establish fraud, to make some independent, clear showing of some unreported gambling income of Mr. De Cavalcante and *117 Mr. Barrasso. Mr. Barrasso and Mr. De Cavalcante are collaterally estopped only to deny that at sometime during the period January 1, 1965, through December 15, 1969, they conspired with some of the other individuals charged with them in the indictments to operate a lottery which was illegal. This in no way shows the precise connection of Mr. Barrasso and Mr. De Cavalcante with the lottery. However, there is other evidence in the record connecting Mr. Barrasso and Mr. De Cavalcante with the lottery. Both of them in effect admitted in court when they were questioned before their guilty pleas were accepted that they did the acts charged in the indictments. In effect they each admitted that they supervised and controlled a lottery operation. This admission, though not collateral estoppel, is strong evidence to show that they did at least at sometime during the period January 1, 1965, through December 15, 1969, supervise and control a lottery operation with the other persons charged in the indictment. Mr. De Pasque testified that he knew of the connection with the lottery operation in which he worked of most of the individuals charged in the two indictments other than Mr. Barrasso *118 and Mr. De Cavalcante. Mr. De Pasque was also convicted on a plea of guilty under indictment 544-69 as were most of the other individuals charged.
Mr. De Pasque testified that he reported directly to Mr. Louie Luciano and so far as he knew Mr. Luciano was the operator and owner of the lottery in which he worked. In our view, considering his testimony as a whole and his lack of knowledge of Mr. Luciano's activities aside from those with which he was directly connected, this testimony in no way shows that Mr. Luciano was in fact the owner and operator of the lottery operation. In our view, the pleas of guilty to the conspiracy charge by Mr. Barrasso and Mr. De Cavalcante, considered in conjunction with their admissions in open court and with Mr. De Pasque's testimony, are clear and convincing evidence that Mr. Barrasso and Mr. De Cavalcante were in the hierarchy of a gambling operation for such time as that operation is shown by other evidence to have been in existence. Mr. De Pasque testified that he was involved in the lottery operation from mid-1968 to December 15, 1969. There is also evidence aside from Mr. De Pasque's testimony showing the existence of the lottery operation. *119 During a substantial portion of this period surveillance of Mr. De Cavalcante and Mr. Barrasso indicated that they met with certain individuals involved in the lottery operation. Also the names "Sam" and "Barr" were referred to on the tapes of the telephone operations of the lottery. Having shown that Mr. Barrasso and Mr. De Cavalcante were connected at a high level with the operation from mid-1968 to December 15, 1969, respondent has shown that they derived some income from the operation that they failed to report. See Pinder v. United States,330 F.2d 119 (5th Cir. 1964); Gerardo v. Commissioner,552 F.2d 549 (3d Cir. 1977), affg. in part and revg. in part a Memorandum Opinion of this Court; Fiorella v. Commissioner,361 F.2d 326 (5th Cir. 1966), affg. a Memorandum Opinion of this Court. In concluding that respondent has shown by clear and convincing evidence that there was an underpayment of tax by Mr. Barrasso and Mr. De Cavalcante for the years 1968 and 1969 some of which was due to fraud by having shown that they had unreported income from a lottery operation which they knew to be properly taxable income, we have not *120 overlooked the testimony of Mr. Thomas J. LaManna. The Court not only listened with care to all of his testimony but has studied it again. The short answer to the reason no findings are based on Mr. LaManna's testimony is that the Court does not believe his testimony. His testimony in effect was that Louie Luciano stated to him and to Mr. Bozza, the attorney who entered the plea of guilty on Mr. Barrasso's behalf, and possibly another attorney, Mr. Gold, that the lottery operation involved in the conspiracy charge was his, and Mr. Barrasso and Mr. De Cavalcante had nothing to do with it. The Court was not satisfied with Mr. LaManna's explanation of why he would be present in court when two men were sentenced to 5-year prison terms and fines without disclosing that he had heard Mr. Luciano make this statement with respect to the lottery operation. From the record of the hearing on Mr. De Cavalcante's motion to withdraw his guilty plea, apparently Mr. Bozza, who is now dead, was a respected officer of the court in which the pleas were entered and appeared as an attorney in that court on numerous occasions. He testified at the hearing on Mr. De Cavalcante's motion to withdraw his *121 guilty plea. This Court cannot believe testimony which would require a conclusion that an attorney in good standing and highly respected at the bar would plead a client guilty having been informed by another individual that the operation charged to that client was in fact his and that the attorney's client had no connection with it. Furthermore, apparently Mr. Gold would have been available to testify but was not called. The burden is, of course, on respondent to show fraud by clear and convincing evidence. Foster v. Commissioner,487 F.2d 902 (6th Cir. 1973), affg. a Memorandum Opinion of this Court. This we think he has done with respect to the years 1968 and 1969 in connection with both Mr. Barrasso and Mr. De Cavalcante. We however conclude that respondent has totally failed to show that either Mr. De Cavalcante or Mr. Barrasso fraudulently omitted from their returns any gambling income for the years 1965, 1966 and 1967. Respondent has shown no evidence of a gambling operation in these years from which they might have derived any income. He has not shown for *122 any of the years 1965, 1966 and 1967 the existence of any gambling operation from which either Mr. Barrasso or Mr. De Cavalcante might have derived income. Respondent has shown no fraud with respect to Mrs. Barrasso in any year. As we noted in Footnote 3, supra, apparently he is not contending fraud with respect to her even though the fraud addition was included in determining the Barrassos' tax liability. [6] The parties stipulated that Mrs. De Cavalcante agrees that if respondent establishes for any of the years here in issue that any part of the understatement of income is due to fraud, she is liable for that year for the addition to tax for fraud under Section 6653(b). As far as the tax liability of Mr. and Mrs. Barrasso, if any, for the years 1965, 1966 and 1967 is concerned, it is barred by the statute of limitations due to failure of respondent to prove fraud. The same is true with respect to the tax liability of Mr. and Mrs. De Cavalcante for 1965. *123 This brings us to the issues of the amount of unreported gambling income of Mr. Barrasso and Mr. De Cavalcante for the years 1968 and 1969 and whether Mr. De Cavalcante had any unreported gambling income for the years 1966 and 1967.[7]
As we have previously pointed out, there is no evidence in the record to establish that there did exist the gambling operation in which Mr. Barrasso or Mr. De Cavalcante participated and from which they could derive gambling income prior to the year 1968. However, whereas the burden is on respondent to show such income for the purpose of establishing fraud, Green v. Commissioner,66 T.C. 538, 549 (1976), the burden is on petitioners to show error in respondent's determination of the tax liability. As was pointed out in Gerardo v. Commissioner,supra (552 F.2d 549 (3d Cir. 1977)), it is very difficult to establish a negative. Both Mr. Barrasso and Mr. De Cavalcante testified *124 that they had no income from gambling during any of the years here in issue. In view of all the facts in this case, we have not accepted this testimony and have found to the contrary from other clear evidence in the record with respect to 1968 and 1969. For the years 1965 through 1967 it is not necessary to rely on the testimony of Mr. Barrasso and Mr. De Cavalcante for some evidence that they did not have income from a gambling operation in any of the years 1965 through 1967. As pointed out in Footnote 5, supra, the fact that no evidence was discovered by investigators for the Department of Justice and the Internal Revenue Service of the gambling operations of which Mr. Barrasso and Mr. De Cavalcante were a part prior to the year 1968, coupled with the evidence of the intensive investigation conducted of the activities of Mr. Barrasso and Mr. De Cavalcante, is some indication that neither of them had gambling income in the years prior to 1968. Gerardo v. Commissioner,supra.Once this evidence was received, respondent should have gone forward with some evidence of gambling operations in the years 1965 through 1967 to rebut petitioners' evidence, and he *125 has produced none. We therefore conclude on the record before us that neither Mr. Barrasso nor Mr. De Cavalcante had any gambling income for any years prior to 1968. Considering the fact that this record shows that gambling operations are generally conducted in cash, that neither Mr. Barrasso nor Mr. De Cavalcante came forward with any books or records of their income from gambling and that neither of them made any effort to estimate the amount of that income, respondent's determination of the gain for the owners and supervisors of the entire gambling operation of 30 percent of the estimated gross receipts from the operation is reasonable and is sustained. Fiorella v. Commissioner,supra;Pender v. United States,supra; Gerardo v. Commissioner,supra. In this case respondent assigned the entire amount of the computed 30 percent profits from the operation to Mr. Barrasso, the entire amount to Mr. De Cavalcante, and the entire amount to Mr. De Pasque. We do not have before us sufficient evidence to determine whether Mr. De Pasque shared in the profits and, if he did not, whether in fact a third person in addition to Mr. Barrasso *126 and Mr. De Cavalcante shared in those profits. However, there is some indication in the record that there was some person in between the actual day-to-day operations of the lottery by Mr. De Pasque and Mr. Ippolito and Mr. Barrasso and Mr. De Cavalcante who shared in the profits of the operations.Mr. De Pasque testified that the person to whom he reported was Mr. Louie Luciano. We are aware of the interest Mr. De Pasque had in no part of the owners' profits being considered as his and considering this fact do not accept this testimony as establishing any interest in the operation to have been owned by Mr. Luciano. However, this testimony does indicate that there was a third owner or controller of the operation with Mr. Barrasso and Mr. De Cavalcante. Using our best judgment on the basis of this record as a whole, we conclude that Mr. De Cavalcante and Mr. Barrasso each participated to the extent of one-third of the 30 percent profits from the overall operation as determined by respondent or, stated another way, that each had a profit of 10 percent of the total operation during the period January 1 to December 15, 1969. In fact, the testimony of respondent's expert witness as to *127 the various methods of profit splitting by supervisors or owners of a lottery operation gives some support to this determination. For the year 1968 our inclination would be to accept the Commissioner's determination on the basis that the lottery operated for that entire year as did this Court in Gerardo v. Commissioner,supra. However, the Court of Appeals for the Third Circuit, to which an appeal in this case would lie, concluded that income should be assigned to an individual engaged in a gambling operation only for the period that respondent had evidence of the actual functioning of that operation. [8] The facts in Gerardo v. Commissioner,supra, are in all material respects indistinguishable from the facts in this case. The taxpayer involved in the Gerardo case had been convicted in a New Jersey court of conspiracy in connection with a gambling operation.The taxpayer's income had been computed in a manner identical to the method used here to compute the gambling income of Mr. Barrasso and Mr. De Cavalcante. The connection of the taxpayer in that case with the gambling operation was determined by surveillance and other indirect *128 evidence as it was here. There, the Circuit Court limited the time for which income from the gambling operation could be assigned to the taxpayer as the manager of the operation to the period that the evidence actually showed the operation to exist. *129 The evidence here does not show the gambling operation which formed the basis of the conspiracy charge against Mr. Barrasso and Mr. De Cavalcante to actually have been in existence prior to approximately July 1, 1968. Mr. De Pasque testified that he went with the operation sometime in July or August of 1968 and that it was operating when he went with it but he could not say how long before that time it had been operating. The surveillance by the special agents of the Internal Revenue Service began in late 1968 as did the telephone surveillance of the lottery operation. If the determination of the Third Circuit is viewed as a pronouncement of law, we are required under our holding in Golsen v. Commissioner,54 T.C. 742, affd. 445 F.2d 985 (10th Cir. 1971), to follow it. Whether or not this case would fall under our rule in the Golsen case considering that some factual distinctions exist in the two cases and the factual nature of the determination to be made in cases such as this, we have concluded that considering all the circumstances of this case we should and will follow the holding of the Circuit Court in the Gerardo case in this case. *130 Following the holding of the Third Circuit in the Gerardo case, we conclude that in this case Mr. Barrasso and Mr. De Cavalcante can properly be charged with gambling income only for the period from July 1, 1968, through December 15, 1969. Therefore, we conclude that only the supervisor's profits for the period July 1, 1968, through December 31, 1968, from the gambling operation are properly to be considered as income of Mr. Barrasso and Mr. De Cavalcante under the holding in Gerardo v. Commissioner,supra.We conclude for the same reasons stated with respect to the year 1969 that each Mr. Barrasso and Mr. De Cavalcante received one-third of the 30 percent profits or a 10 percent profit each from the gambling operation in 1968 during the period July 1 through December 31 of that year. The evidence with respect to the investment of Mr. De Cavalcante in De Wolf Corporation and Elton Estates is not completely clear. However, it is clear that Mr. De Cavalcante made some payment for his stock in De Wolf Corporation. Mr. De Cavalcante contends that he only paid $ 7,500 for this stock and that this $ 7,500 was paid by having checks drawn to him by Controlled *131 Heating deposited in Mr. Wolfson's account.There is evidence, and we have so found, that some checks drawn to Mr. De Cavalcante by Controlled Heating were deposited in Mr. Wolfson's account. The record is not clear whether the amount of these checks was included by Mr. De Cavalcante in his income and the only basis for concluding that the total payment which Mr. De Cavalcante made for his stock in De Wolf Corporation was the amount of these checks is the testimony of Mr. Wolfson to the effect that he just decided to stop having Mr. De Cavalcante pay any more and give him the balance of the stock. The record is clear that half the stock in De Wolf Corporation was worth substantially more than the approximately $ 7,500 of checks which Mr. Wolfson testified was all he asked for the stock.Mr. Wolfson and Mr. De Cavalcante were equal owners of Controlled Heating Corporation and had a number of business operations in which they both participated. Their transactions were primarily oral and for that reason the attempted proof is the oral testimony of Mr. Wolfson. Mr. Wolfson depended primarily on his recollection of their business transactions. Considering the numerous business transactions *132 between Mr. Wolfson and Mr. De Cavalcante, we do not consider Mr. Wolfson's recollection of the transactions unassisted by records other than a few checks and deposit accounts to be reliable. On the basis of this record, we conclude that petitioners De Cavalcante have failed to show that they did not have unreported income in 1968 of $ 13,625 with respect to the purchase of an interest in De Wolf Corporation. With respect to Elton Estates, the evidence is clearer. Even though, again, Mr. Wolfson testifiled that he "gave" Mr. De Cavalcante one-half of his 60 percent stock interest in Elton Estates, in our view the evidence shows that Mr. Wolfson transferred one-half of his 60 percent stock interest to Mr. De Cavalcante in return for Mr. De Cavalcante putting up his stock in De Wolf Corporation as security for a $ 45,000 loan to Elton Estates. However, we conclude that this transaction did not result in a necessity for any cash payment in 1968 by Mr. De Cavalcante. We therefore conclude that respondent erred in determining that Mr. De Cavalcante had $ 32,100 of income with respect to his investment in Elton Estates in 1968. The only evidence with respect to the unexplained *133 payment deposit by Mr. De Cavalcante of $ 2,362.50 is the testimony of Mr. Wolfson that the check he drew in this amount to Mr. De Cavalcante was in repayment of numerous small loans made to him by Mr. De Cavalcante in amounts of $ 10, $ 25 or $ 50 over a period of time. Considering the business relationship between Mr. Wolfson and Mr. De Cavalcante and Mr. Wolfson's reliance on memory unassisted by any records, this explanation does not satisfy the Court that in fact the $ 2,362.50 was in repayment of loans rather than a payment to Mr. De Cavalcante which is includable by him in income. It does not seem feasible that two men associated in business would let small $ 10, $ 25 and $ 50 loans accumulate to such a sum before repayment if the loans were strictly on a personal basis as petitioners would have the Court believe. Mr. Wolfson testified that he rarely carried money and that from time to time would borrow small sums from Mr. De Cavalcante, and that one day Mr. De Cavalcante asked him when he was going to pay these borrowings back and he wrote the check to Mr. De Cavalcante for the amount of $ 2,362.50.No records were produced to show the loans made and no credible evidence *134 was offered as to why such an arrangement would persist for such a period of time. The record is clear that Mr. Wolfson and Mr. De Cavalcante were connected in a number of business associations. We sustain respondent's determination with respect to the $ 2,362.50 since, in our view, there is no credible evidence in the record to overcome this determination. The record does show the deposit by Mr. De Cavalcante of a check from Mr. Wolfson in the amount determined by respondent to be additional income. The final issue in this case is whether Mrs. Marion Barrasso should be relieved of liability for each of the years 1968 and 1969 under the provisions of section 6013(e). Section 6013(e)[9] provides that where a joint return has been made for a taxable year from which there was omitted gross income of one spouse in excess of 25 percent of the gross income stated on the return, if the other spouse establishes that in signing the return he or she did not know of or had no reason to know of such omission, and taking into account whether the other spouse significantly benefited directly or indirectly *135 from the items omitted from gross income and all of the facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax attributable to such omission for such taxable year, then the other spouse shall be relieved from such liability. *136 Mrs. Barrasso testified in effect that she did not know what her husband did and did not keep up with what he did, and therefore had no reason to know of the omitted income. In our view, considering the small amount of income reported by the Barrossos and the standard of living that the record shows they maintained, it is not reasonable to conclude that Mrs. Barrasso did not know that Mr. Barrasso had income which was not reported on their tax return. Certainly it could not be concluded that she had no reason to know of the omission of this income. Whether she knew the source of the omitted income is not material to the determination here. She certainly has failed to show that she reasonably should not have known that Mr. Barrasso had substantially more income than was reported on their joint Federal income tax return. We therefore hold that Mrs. Barrasso is not entitled to relief from taxes for the years 1968 and 1969 under section 6013(e). Decisions will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise stated.↩
2. Initially respondent determined a deficiency in the income tax of Simone De Cavalcante and Mary De Cavalcante and an addition to tax under section 6653(b)↩ for the calendar year 1964. However, at the trial respondent conceded error in his determination with respect to this year.
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise stated.↩
3. Respondent's determination of the addition to tax for fraud was with respect to both petitioners in each case. However, we gather that respondent does not contend that there did exist fraud on the part of Mrs. Barrasso. In any event, he has made no argument of any fraud on her part and has made no showing of fraud by her.↩
4. The record is clear that respondent assigned the 30 percent computed gain from the entire operation to both Mr. Barrasso and Mr. De Cavalcante. The record is not clear why the income assigned to each is not for that reason identical.↩
5. Mr. John R. Bartels, who was in charge of the strike force in New Jersey for the Department of Justice at the time of the indictments of Mr. De Cavalcante and Mr. Barrasso testified in this case. He testified that he was the person in charge of the conspiracy cases involving Mr. De Cavalcante and Mr. Barrasso and that he was the attorney who presented evidence to the Grand Jury in obtaining indictments 544-69 and 545-69. He testified that no evidence was presented to the Grand Jury with respect to any activity of any of the persons charged in Indictment No. 544-69 and Indictment No. 545-69 for any year prior to 1968. He testified that there was no evidence in the files of the Department of Justice of which he was in charge with respect to any activity of the lottery operation which was the basis of the conspiracy prior to 1968. He testified that the prior three years were included in the indictment because they were within the statutory period for charging conspiracy prior to the indictment and if evidence with respect to those years was discovered prior to or during the trial it could be offered under the indictment. While this testimony is not proof that the gambling operations did not exist prior to 1968, when considered in conjunction with the evidence of the thorough investigation made by the FBI and the special agents of the Revenue Service, it is some indication that the operation did not exist prior to 1968.↩
6. Section 6653(b) provides: (b) Fraud.--If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under subsection (a). In the case of a joint return under section 6013↩, this subsection shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse.
7. Even though no fraud has been shown with respect to Mrs. Barrasso, the statute is open with respect to her tax liability since fraud has been shown for 1968 and 1969 with respect to her husband with whom she filed a joint tax return.↩
8. In this connection the Circuit Court stated in Gerardo v. Commissioner,552 F.2d 549, 553-554 (3d Cir. 1977), affg. in part and revg. in part a Memorandum Opinion of this Court, as follows: In the Tax Court, Gerardo's only attempt to meet his burden of rebutting the Commissioner's evidence consisted of self-serving denials of his involvement.The Tax Court, in concluding that Gerardo had realized substantial income from the gambling operations during this period and that he had failed to report this income, did not give and need not have given credence to Gerardo's testimony. See Simon v. Commissioner of Internal Revenue,285 F.2d 422, 424-25 (3d Cir. 1960). While we fully approve the Tax Court's findings and conclusions as they pertain to the period August 5, 1966 through February 3, 1967, we are troubled by the extent of the Tax Court's determinations which reach back beyond August 5, 1966 to attribute income to Gerardo fro the date of April 4, 1966 up to February 3, 1967. Our concern here is that no evidence appears in the record which links Gerardo to the gambling operation during the period April 4, 1966 through August 5, 1966. We observe that "the absence of adequate tax records [as in the case here] does not give the Commissioner carte blanche for imposing Draconian absolutes." See Webb v. Commissioner of Internal Revenue,394 F.2d 366, 373 (5th Cir. 1968). Furthermore, where the Commissioner issues a "naked" assessment, his determination of tax due may be "'without rational foundation and excessive,' and not properly subject to the usual rule with respect to the burden of proof in tax cases." See United States v. Janis,428 U.S. 433, 441, 96 S.Ct. 3021, 3026, 49 L.Ed.2d 1046 (1976). In Pizzarello v. United States,408 F.2d 579 (2d Cir. 1969), cert.denied,396 U.S. 986, 90 S.Ct. 481, 24 L.Ed.2d 450 (1970), the Second Circuit considered a situation involving an assessment of gambling income where no rational foundation for the assessment had been established. Pizzarello involved a suit to enjoin the levy of a jeopardy assessment. There, Pizzarello, the taxpayer, was arrested on April 15, 1965 and charged with operating a bookmaking establishment from March 30, 1965 through April 15, 1965. Following a dismissal of the criminal charges due to his illegal arrest, the Commissioner issued an assessment for the period from April 1, 1960 through April 15, 1965, based on a formula identical to the formula employed in the instant case. Pizarello produced no records to contradict the Commissioner's assessment. Nevertheless, the Second Circuit held that the assessment was excessive, arbitrary and without factual foundation, declaring: "there is no proof in the record before us that Pizzarello operated as a gambler for five years….No court could properly make such inferences without some foundation of fact." Id. at 583.In further support of its ruling, the court cited the fact that Pizzarello's indictment covered only the period from March 30, 1965 through April 15, 1965, and "notwithstanding the Government's assertion that there is substantial evidence of an extensive gambling operation here, at his trial evidence of gambling activity was limited to a period of only slightly over two weeks." Id. at 584. Here, the record of the proceedings before the Tax Court contains only one reference to the April 4 assessment date. An IRS special agent testified that: "On April 4, 1966, the Essex County Prosecutor's Office conducted a raid on a residence in the north Newark area and at that time, they seized a large volume of bet slips contained in a brown paper bag or several brown paper bags and I compared the bet slips, that is the envelopes and the slips that were seized by the prosecutor to the ones that were seized by us and found that the codes, most of the codes corresponded with the codes that were found on the slips--envelopes that we found. Also, we found that there were--several people were arrested by the prosecutor's office at that time who were observed to be in the operation that we investigated. So, we took as a beginning date, the date that the Essex County raid was conducted. (Emphasis added.)" Transcript at 101-02. Our independent search of the record reveals no other "evidence" which could conceivably support an inference that Gerardo was involved in these activities and this lottery on April 4, 1966 continuing thereafter to August 5, 1966. * * *
We are obliged to conclude therefore that, absent proof in the record that Gerardo was involved in gambling activities from April 4, 1966 through August 5, 1966, no court could properly draw an inference of such involvement. See Pizzarello v. United States,supra at 583. The Tax Court made no specific findings with regard to the April 4 starting date and apparently relied on the Commissioner's presumption of correctness and Gerardo's failure to present evidence in rebuttal. Here, in order to give effect to the presumption on which the Commissioner relies, some evidence must appear which would support an inference of the taxpayer's involvement in gambling activity during the period covered by the assessment. Without that evidentiary foundation, minimal though it may be, an assessment may not be supported even where the taxpayer is silent. See Pizzarello v. United States,supra↩ at 583. [Footnotes omitted.]
9. Sec. 6013(e) provides as follows: (e) Spouse Relieved of Liability in Certain Cases.-- (1) In General. Under regulations prescribed by the Secretary or his delegate, if-- (A) a joint return has been made under this section for a taxable year and on such return there was omitted from gross income an amount properly includable therein which is attributable to one spouse and which is in excess of 25 percent of the amount of gross income stated in the return, (B) the other spouse establishes that in signing the return he or she did not know of, and had no reason to know of, such omission, and (C) taking into account whether or not the other spouse significantly benefited directly or indirectly from the items omitted from gross income and taking into account all other facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such omission, then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent that such liability is attributable to such omission from gross income. (2) Special Rules.--For purposes of paragraph (1)-- (A) the determination of the spouse to whom items of gross income (other than gross income from property) are attributable shall be made without regard to community property laws, and (B) the amount omitted from gross income shall be determined in the manner provided by section 6501(e)(1)(A)↩.